IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 37002

KNIPE LAND COMPANY, an Idaho
corporation,

    Plaintiff-Cross Respondent-Appellant,

v.

RICHARD A. ROBERTSON, JOHNNIE L.
ROBERTSON, husband and wife, and
ROBERTSON KENNELS, INC., an Idaho
corporation,

    Defendants-Third Party Plaintiffs-
    Cross-Appellants-Respondents,

and

JOHN KNIPE, an individual,

    Third Party Defendant-Cross
    Respondent-Appellant,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, February 2011 Term

2011 Opinion No. 46

Filed: March 23, 2011

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Third Judicial District, State of Idaho, Payette County. Hon. Stephen W. Drescher, District Judge.

District court's denial of Appellants' motion for a judgment notwithstanding the verdict reversed, damages and attorney fees award vacated, case remanded with instructions to enter a judgment in favor of Appellants and determine damages consistent with this opinion, including a determination of whether attorney fees and costs should be awarded to Appellants for the proceedings below.

Stoel Rives, Boise, for appellants. Mark S. Geston argued.

Brassey, Wetherell & Crawford, LLP, Boise; Derek A. Pica, Boise, for respondents. Robert T. Wetherell argued.

1

BURDICK, Justice

Knipe Land Company ("KLC") and John Knipe ("Knipe") appeal from a jury verdict in favor of Richard Robertson, Johnnie Robertson and Robertson Kennels, Inc. (collectively, "Respondents"). KLC and Knipe (collectively, "Appellants") ask that this Court grant a judgment notwithstanding the verdict or, alternatively, a new trial. Appellants also argue that the district court erred in failing to apportion an award of attorney fees between KLC and Knipe. Respondents cross-appeal, arguing that the district court erred in not entering a directed verdict in their favor under the *Ellsworth Dobbs* doctrine. Respondents also argue that their affirmative defense of waiver would preclude recovery for Appellants, even if this Court did determine that the jury erred. In addition, Respondents claim that the district court should have granted restitution and/or a constructive trust under the Idaho Consumer Protection Act ("ICPA") ordering the return of $22,500 that was advanced to KLC as a commission. Finally, Respondents contend that the district court abused its discretion in significantly reducing post-trial attorney fees awarded to Respondents. We reverse the district court's denial of Appellants' motion for a judgment notwithstanding the verdict and remand with instructions to enter a judgment consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

KLC is an Idaho corporation acting as an agent and broker for the purchase and sale of agricultural and commercial real property in Idaho and surrounding states. Knipe serves as President of KLC, and is a real estate agent and broker licensed to work in Idaho. Rowena Strain ("Strain") is a real estate agent who works for KLC. Richard Robertson and Johnnie Robertson (the "Robertsons"), a married couple, own approximately 1,400 acres of real property in Payette County. The Robertsons and their son are the sole shareholders in Robertson Kennels, Inc. ("Robertson Kennels"), an Idaho corporation, which owns approximately 1,887 acres of real property in Payette and Washington counties.

On September 1, 2005, the Robertsons entered into an employment contract with KLC (the "2005 Employment Contract"), wherein KLC was granted an exclusive listing to sell the 1,400 acres owned by the Robertsons. Under the 2005 Employment Contract, if KLC secured a buyer and a sale went through to closing, KLC would be entitled to either a 6% or 7% commission depending upon whether the purchaser employed their own broker. On February 6, 2007, Richard Robertson, acting as a representative of Robertson Kennels, entered into an

2

employment contract with KLC (the "2007 Employment Contract"),[1] wherein KLC was granted an exclusive listing to sell the 1,887 acres owned by Robertson Kennels. Under the 2007 Employment Contract, if KLC secured a buyer and the sale went through to closing, KLC would be entitled to a 5% commission. The Employment Contracts contained an identical clause, providing:

> Should a deposit or amounts paid on account of purchase be forfeited, one-half thereof may be retained by you, as the Broker, as the balance shall be paid to me. The Broker's share of any forfeited deposit or amounts paid on account of purchase, however, shall not exceed the commission.

On November 1, 2005, Robert and Sheila Harmon (the "Harmons") signed a purchase contract with KLC to purchase the Robertsons' real property, paying $50,000 in earnest money which was to be held in the Harmons' real estate broker's trust account. Under the terms of that purchase contract (the "Harmon Contract"), the purchase of the Robertsons' land was contingent upon the Harmons being able to sell their own property; the Harmons would be entitled to a return of their earnest money and be under no obligations to continue the purchase if their own property did not sell. Subsequently the Harmons agreed that $35,000 of the $50,000 in earnest money that they had paid would be considered nonrefundable even if their own property did not sell. These funds were made nonrefundable in return for two extensions of the closing date. The first extension resulted in a $25,000 increase in the sale price and $25,000 of the earnest money becoming nonrefundable. The second extension resulted in no increase in the sale price, but an additional $10,000 in earnest money became nonrefundable. Following the second extension, the $35,000 of nonrefundable earnest money was transferred from the Harmons' real estate broker to KLC, which in turn disbursed it to the Robertsons. The Harmons were unable to sell their own property and terminated the Harmon Contract on August 18, 2006; at that time the $15,000 of earnest money that remained in the Harmons' real estate broker's trust account was returned to the Harmons, as agreed under the Harmon Contract. KLC did not demand any portion of the forfeited $35,000 at the time of the Harmon Contract termination.

On August 24, 2007, KLC and Respondents executed a renewal of the Employment Contracts, extending the contract terms to February 28, 2008, and stipulating to a 5% commission rate for all of Respondents' properties.

---

[1] When referenced collectively, the 2005 Employment Contract and 2007 Employment Contract shall be referred to as the "Employment Contracts."

On September 24, 2007, MidAmerican Nuclear Energy Company, LLC ("MidAmerican") entered into an agreement with Respondents to purchase all of their property for an amount that the parties have agreed will be kept confidential. On October 24, 2007, MidAmerican entered into three separate agreements (the "MidAmerican Contracts") to purchase Respondents' property, which replaced the September 24 agreement. As of January 25, 2008, MidAmerican had made three separate payments, for a total of $450,000, which were deposited with the closing agent, First American Title Co ("First American"). It was agreed that if MidAmerican completed the acquisition of Respondents' property, the $450,000 would be credited toward the purchase price, but if the acquisition was not completed, MidAmerican would abandon all rights to those funds. As all parties agreed that the $450,000 was nonrefundable, First American disbursed $427,500 to Respondents and $22,500 to KLC prior to January 25, 2008. On January 25, 2008, MidAmerican informed Respondents that it was terminating the MidAmerican Contracts and would not complete acquisition of Respondents' properties.

On April 2, 2008, KLC demanded that the Robertsons turn over half of the $35,000 in earnest money that was forfeited to the Robertsons when the Harmons terminated the Harmon Contract. KLC also demanded half of the $450,000 that MidAmerican abandoned, minus the $22,500 that had already been paid to KLC. Respondents refused both demands and made their own demand for a return of the $22,500.

On April 16, 2008, KLC filed suit against Respondents, requesting *inter alia*, payment of the funds that it claimed it was entitled to from the forfeiture of funds under both the Harmon Contract and the MidAmerican Contracts. Respondents answered arguing, *inter alia*, that the MidAmerican Contracts had not been "breached", and therefore no funds had been "forfeited." Respondents also counterclaimed, arguing that: (1) KLC and Knipe violated the Idaho Consumer Protection Act in drafting the Employment Contracts; and (2) KLC committed conversion in retaining $22,500 from the MidAmerican money after the MidAmerican Contracts were terminated.

Both Appellants and Respondents moved for summary judgment. The district court partially granted Appellants' motion in finding that the Employment Contracts were valid and contained no legal deficiencies, but denied the remainder of Appellants' motion and denied Respondents' motion.

4

Following trial, the jury found that Respondents were not in breach of the Employment Contracts, and that Knipe had not converted $22,500 of Respondents' money for his own use, but found that Knipe had violated the Idaho Consumer Protection Act. The jury awarded Respondents $1,000 in damages for the ICPA violation. On July 7, 2009, the district court entered a judgment to this effect and retained jurisdiction for the purpose of allowing Respondents to file additional ICPA claims within the subsequent fourteen-day period and any potential equitable remedies thereunder.

On July 13, 2009, Respondents made a motion for additional equitable relief under ICPA, requesting that the court impose a constructive trust on the $22,500 that Appellants retained from the MidAmerican money. Respondents also requested that the court enjoin KLC from employing the disputed forfeiture clause in future contracts. Finally, Respondents requested that they be awarded punitive damages. Appellants, in turn, sought a judgment notwithstanding the verdict ("JNOV") or, in the alternative, a new trial.

The district court found that sufficient evidence supported the jury's verdict and accordingly denied Appellants' requested JNOV. The court likewise denied Appellants' motion for a new trial and Respondents' post-trial ICPA requests. The district court awarded attorney fees to Respondents. A judgment to this effect was entered on September 30, 2009. Appellants filed their notice of Appeal on October 1, 2009.

## II. ISSUES ON APPEAL

1. Whether the district court erred in denying Appellants' motion for a JNOV on KLC's claim of entitlement to forfeited monies under the Employment Contracts, on the basis that the district court erred in failing to rule as a matter of law that the Employment Contracts were unambiguous and enforce them accordingly.

2. Whether the district court erred in denying Appellants' motion for a JNOV on Respondents' allegation that Knipe violated ICPA, as no evidence supported the jury's verdict.

3. Whether Respondents demonstrated that KLC waived its right to enforce the Employment Contracts.

4. Whether the clause of the Employment Contracts concerning the distribution of forfeited funds should be deemed void as a matter of public policy under the *Ellsworth Dobbs* doctrine.

5. Whether the district court erred in failing to apportion attorney fees between KLC and Knipe, and whether the court erred in reducing post-trial attorney fees awarded to Respondents.

6. Whether either party is entitled to attorney fees on appeal.

5

# III. ANALYSIS

## A. Judgment Notwithstanding the Verdict

### 1. Standard of Review

As this Court wrote in *Bates v. Seldin*:

> This Court reviews de novo a district court's decision to deny a motion for a judgment notwithstanding the verdict. The standard of review of a grant or denial of a motion for judgment notwithstanding the verdict is the same as that of the trial court when ruling on the motion. A trial court will deny a motion for judgment notwithstanding the verdict if there is evidence of sufficient quantity and probative value that reasonable minds could have reached a similar conclusion to that of the jury. A trial court is not free to weigh the evidence or pass on the credibility of witnesses, making its own independent findings of fact and comparing them to the jury's findings. A trial court reviews the facts as if the moving party admitted any adverse facts and draws all reasonable inferences in favor of the non-moving party.

146 Idaho 772, 774–75, 203 P.3d 702, 704–05 (2009) (internal citations omitted).

### 2. The Employment Contracts were unambiguous.

This case centers on the interpretation and application of one sentence in the Employment Contracts entered into between KLC and Respondents on September 1, 2005, and February 6, 2007: "Should a deposit or amounts paid on account of purchase be forfeited, one-half thereof may be retained by you, as the Broker, as the balance shall be paid to me." Appellants argue that this provision is unambiguous and, as such, Respondents should not have been permitted to submit evidence to the jury as to the interpretation of that provision. Respondents argue that the district court implicitly found that the contract provision suffered from a latent ambiguity, and appropriately allowed extrinsic evidence on its meaning.

As provided by this Court in *Potlatch Education Ass'n v. Potlatch School District No. 285*:

> When interpreting a contract, this Court begins with the document's language. In the absence of ambiguity, the document must be construed in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument. Interpreting an unambiguous contract and determining whether there has been a violation of that contract is an issue of law subject to free review. A contract term is ambiguous when there are two different reasonable interpretations or the language is nonsensical. Whether a contract is ambiguous is a question of law, but interpreting an ambiguous term is an issue of fact.

148 Idaho 630, 633, 226 P.3d 1277, 1280 (2010) (internal citations and quotations omitted).

Whether an ambiguity exists in a legal instrument is a question of law, over which this Court exercises free review. *Cool v. Mountainview Landowners Coop. Ass'n*, 139 Idaho 770, 772, 86 P.3d 484, 486 (2004). Where a legal instrument is found to be unambiguous the legal effect must be decided by the district court as a matter of law; it is only when that instrument is found to be ambiguous that evidence as to the meaning of that instrument may be submitted to the finder of fact. *Id.* "[E]vidence of custom or usage may not be introduced to vary or contradict the terms of a plain and unambiguous contract . . . ." *Id.* at 773, 86 P.3d at 487 (quotation omitted).

There are two types of ambiguity, patent and latent. A patent ambiguity is an ambiguity clear from the face of the instrument in question. *Id.* "Idaho courts look solely to the face of a written agreement to determine whether it is patently ambiguous." *Swanson v. Beco Constr. Co.*, 145 Idaho 59, 62, 175 P.3d 748, 751 (2007) (quotation omitted). The disputed provision of the Employment Contracts is unambiguous on its face. "The word forfeit is in common usage and its popular and accepted meaning is to lose or to lose the right to." *Nagel v. Hammond*, 90 Idaho 96, 100, 408 P.2d 468, 470 (1965) (internal quotation marks omitted). Neither is the term "a deposit or amounts paid on account of purchase" ambiguous on the face of the Employment Contracts. This is a clear limitation that the division of forfeited money is only applicable where: (1) money was paid pursuant to an agreement to purchase the property, and (2) where that anticipated purchase was not completed.

A latent ambiguity exists where an instrument is clear on its face, but loses that clarity when applied to the facts as they exist. *Cool*, 139 Idaho at 773, 86 P.3d at 487. Although parol evidence generally cannot be submitted to contradict, vary, add or subtract from the terms of a written agreement that is deemed unambiguous on its face, there is an exception to this general rule where a latent ambiguity appears. *Salfeety v. Seideman* (*In re Estate of Kirk*), 127 Idaho 817, 824, 907 P.2d 794, 801 (1995). Where the facts in existence reveal a latent ambiguity in a contract, the court seeks to determine what the intent of the parties was at the time they entered into the contract. *See Snoderly v. Bower*, 30 Idaho 484, 488, 166 P. 265, 266 (1917) ("It is not for the court or jury to make a contract for the parties, but only to determine what the parties intended the ambiguous terms to mean at the time they entered into the agreement.").

In *Cool*, this Court heard an appeal on the interpretation of a written easement, allowing certain landowners to use a designated beach area "for swimming and boating only". 139 Idaho

7

at 772, 86 P.3d at 486. As a determination of law, this Court exercised free review on the issue of whether the term "swimming" was ambiguous under the written easement. *Id*. at 773, 86 P.3d at 487. It was found that a latent ambiguity existed under the facts of the case, due to the absurdity that would have resulted in interpreting "swimming" strictly as "to propel oneself through water" as Appellants advocated. *Id*. This Court noted that under such an interpretation parents would be unable to act as lifeguards for their swimming children, and swimmers could not rest on the beach or stand in the water. *Id*. It was therefore determined that, as applied to the facts, swimming was ambiguous. *Id*. This Court went on to note that it was unclear whether there was even an unambiguous definition of "swimming", but having determined that "swimming" was ambiguous as applied, it declined to determine whether "swimming" was patently ambiguous as well. *Id*.

Respondents erroneously interpret *Cool* as supporting the proposition that an alternative dictionary definition of a word may be used to demonstrate a latent ambiguity. As discussed above, the statement by this Court in *Cool* regarding an alternative dictionary definition of "swimming" pertained to a consideration of whether the written easement was patently ambiguous, an issue this Court declined to rule on, having already found a latent ambiguity to exist. Thus, the discussion of an alternative dictionary definition in *Cool* is properly viewed as dicta.

Respondents also argue that if the Employment Contracts are interpreted according to their plain meaning, an absurdity will result, as KLC would receive more for the termination of the MidAmerican Contracts than they would have received as a commission if the sales had actually gone through. There is language in the Employment Contracts providing that "[t]he Broker's share of any forfeited deposit or amounts paid on account of purchase, however, shall not exceed the commission." Respondents' argument centers on the fact that KLC's potential share of forfeited funds is limited by the 5% commission provided for in the Employment Contracts. MidAmerican employed its own broker, and it is known that KLC—as broker for the seller—would have had to divide its commission with MidAmerican's broker in some fashion had the transactions proceeded to closing. There was some evidence submitted that this was to be an even split, wherein both KLC and MidAmerican's broker would have received 2.5% in commission. Therefore, where KLC is receiving half of the forfeited money, limited only by the 5% commission contained in the Employment Contracts, it could theoretically receive twice as

8

much in the event the sale did not reach closing as it could have had the transactions gone through.

However, any potential split of commission between KLC and the buyer's broker is a third-party agreement outside the scope of the Employment Contracts. The resulting "absurdity" is not akin to the absurdity that this Court found would have resulted in *Cool* (if "swimming" had been strictly interpreted as the appellants advocated), and does not suggest that the parties entering into the contract meant something other than what was plainly stated in the contract. There may be an argument that KLC's entitlement to forfeited money under the Employment Agreements should be limited by public policy (though there has been no suggestion that KLC in any way encouraged MidAmerican not to go through with its purchase), but it certainly does nothing to suggest that the parties intended for the provision of the Employment Contracts to mean anything other than what it plainly says. Nor does the unusual factual situation present here support Respondents' theory that "forfeiture" of funds implies a penalty and requires the breach of a related purchase agreement. Therefore, we find that the district court erred in not ruling as a matter of law that the Employment Contracts were unambiguous.

<u>3. Having found the Employment Contracts unambiguous, there is insufficient evidence to support the jury's verdict that Respondents did not breach the Employment Contracts.</u>

As the district court noted in ruling on Respondents' renewed motion for summary judgment on June 25, 2009, "in both of these transactions, [involving the Harmons and MidAmerican,] the purchasers did forfeit the money, that is, they made a voluntary and unequivocal surrender to any claim or interest in the controverted sums. There was a literal forfeiture." This finding of law was supported by substantial and competent evidence in the record. Therefore, the only remaining issue is whether those forfeited funds were paid "on account of purchase" as required for KLC to be entitled to half of the forfeited funds under the Employment Contracts.

The Harmon Contract, which was entered into on November 4, 2005, was titled "Re-21 Real Estate Purchase and Sale Agreement and Receipt for Earnest Money". Under the unambiguous terms of that contract the Harmons agreed to pay the Robertsons $2,475,000 for the property designated as 8701 Little Willow Road, $50,000 of which was due in earnest money at the time the contract was entered into and $2,425,000 of which was due at closing. Nothing in the contract suggests that the Harmons paid the $50,000 for any purpose other than to purchase the property under the contract. The parties have stipulated that under the terms of the initial

9

contract, the sale was subject to the Harmons' ability to sell their own property, and in the event they could not sell their property they would receive a refund of the $50,000 in earnest money that was submitted. However, the Robertsons and the Harmons subsequently agreed to raise the purchase price by $25,000, and make $35,000 of the $50,000 in earnest money that had already been paid nonrefundable. Richard Robertson acknowledged at trial that the $50,000 in earnest money had been deposited on account of purchase. It is uncontroverted that the Harmons subsequently forfeited, or relinquished their claim to, $35,000 of that $50,000 in earnest money.

Under the MidAmerican Contracts, it is likewise clear that MidAmerican paid non-refundable earnest money for the purchase of Respondents' property. Initially these funds were paid, pursuant to one contract—the September 24, 2007, purchase agreement—which covered the sale of all of Respondents' properties. Later these funds were paid pursuant to three contracts—the October 22, 2007, purchase agreements—which were substantively identical, but created separate transactions for the Robertsons' personal ranch, personal residence and the Robertson Kennels property. These contracts were entered into for the purpose of purchasing Respondents' properties; this is clear on the face of the MidAmerican Contracts, and even the title of the agreements ("Agreement to Sell and Purchase"). Under the MidAmerican Contracts, payments of non-refundable earnest moneys were due on designated dates,[2] and were to be applied toward the purchase price if the deal continued to closing.

Respondents argue that the earnest money was not "funds paid for the purchase of the property", but was instead paid in return for allowing MidAmerican to access and conduct extensive testing on Respondents' property. However, it is clear from the unambiguous MidAmerican Contracts that the money was paid in anticipation of closing, to be applied toward the purchase price. The provisions requiring payment of earnest money are in section 3 of the MidAmerican Contracts, titled "Total Purchase Price" and make no mention of access or testing. In addition, Richard Robertson acknowledged at trial that the money was paid for the purchase of the properties.

We find as a matter of law that Respondents breached the Employment Contracts. It is therefore unnecessary to address several of Appellants arguments, specifically: (1) whether the

---

[2] Reading the terms of the MidAmerican Contracts it appears that MidAmerican was obligated to have paid Respondents $525,010 in non-refundable earnest money, prior to the date when it terminated the contracts. However, the parties have stipulated that $450,000 in non-refundable earnest money was actually given to Respondents, so for whatever reason it appears that $75,010 that should have been received under the MidAmerican Contracts was not received and is not subject to this proceeding.

district court erred in allowing Respondents' counsel to cross-examine Knipe and Strain about I.C. §§ 54-2050(1)(b), 54-2051(4)(e); and (2) whether the district court erred in instructing the jury at the beginning of the trial that the parties had stipulated that the $22,500 received by KLC was its "commission".

### 4. Respondents failed to demonstrate that KLC waived its right to enforce the forfeiture provision of the Employment Contracts.

Respondents argue that even if this Court determines that the Employment Contracts were unambiguous, KLC waived any right to forfeited earnest money under those contracts based on its course of conduct.

"A waiver is a voluntary, intentional relinquishment of a known right or advantage, and the party asserting the waiver must show that he acted in reasonable reliance upon it and that he thereby has altered his position to his detriment." *Fullerton v. Griswold*, 142 Idaho 820, 824, 136 P.3d 291, 295 (2006) (internal quotation omitted). "Waiver is foremost a question of intent." *Seaport Citizens Bank v. Dippel*, 112 Idaho 736, 739, 735 P.2d 1047, 1050 (Ct. App. 1987). A clear intention to waive must be shown before waiver shall be established. *Margaret H. Wayne Trust v. Lipsky*, 123 Idaho 253, 256, 846 P.2d 904, 907 (1993). "Waiver will not be inferred except from a clear and unequivocal act manifesting an intent to waive, or from conduct amounting to estoppel." *Id.* "[W]aiver is a mixed question of law and fact. First, a court must find whether the facts alleged to constitute waiver are true. Second, the court must decide whether, if true, these facts suffice as a matter of law to show waiver." *Seaport*, 112 Idaho at 739, 735 P.2d at 1050.

In the special verdict form, the jury found that Respondents had not breached their contractual duties to Appellants. The jury, therefore, did not reach Respondents' affirmatively pled defense of waiver. In order to determine whether this Court may grant a JNOV, we assume without deciding that any disputed facts alleged to constitute waiver are true, and consider whether those facts suffice as a matter of law to show waiver.

Respondents first argue that KLC waived its rights to forfeited money under the Harmon Contract by disbursing the $35,000 to the Robertsons, implicitly admitting that there was "no dispute as to Robertsons' entitlement to the money pursuant to Idaho Code § 54-2047(2)". Idaho Code § 54-2047 details a real estate broker's duty where there is an issue of disputed earnest money, and section (2) states that "[t]he broker may reasonably rely on the terms of the purchase and sale agreement or other written documents signed by both parties to determine how to

11

disburse the disputed money and may, at the broker's own discretion, make such disbursement . . . ." It is very clear from the record that there was no issue of disputed earnest money at the time KLC disbursed those funds to the Robertsons. The Harmons had relinquished their claim to the funds, and those funds were meant to be applied to the purchase price. As the land sale was still pending, those funds had not yet been "forfeited" under the Employment Contracts and KLC was not yet entitled to a Commission as the sale had not closed. Therefore, KLC would have had no basis to refuse to disburse the nonrefundable earnest money to the Robertsons. This act cannot be said to constitute a waiver.

Respondents make a similar argument about the disbursement of the MidAmerican nonrefundable earnest money and point to KLC's receipt of 5% of the disbursed MidAmerican funds as further evidence that KLC had waived its interest in such funds under the Harmon Contract. Again, KLC had no right to contest the disbursement of funds at the time that the disbursements occurred, as the sales to MidAmerican were still pending and anticipated to close. KLC had no right to 5% of the nonrefundable earnest money at the time that it received it. The Employment Contracts provided that KLC would receive 5% of the sales price as commission, but it was not entitled to that commission until closing. Likewise, KLC's contractual right to half of the forfeited funds deposited on account of purchase (limited by the commission) had not yet accrued, as the sales were pending. Nonetheless, seeming to acknowledge that KLC would be entitled, at a minimum, to 5% of the deposited nonrefundable funds, Respondents signed the disbursal agreement allowing for 5% of the deposited funds to be disbursed to KLC. Respondents' decision to allow such a disbursement in no way demonstrates that KLC was waiving its non-accrued rights or had intended to waive those rights in a previous contract.

Finally, Respondents argue that KLC intended to waive the forfeited Harmon money because KLC knew that the Robertsons were spending that money, but KLC failed to make demand for its share of those funds for eighteen months. Also, Respondents contend that KLC's decision to wait until after Respondents signed renewals of the Employment Contracts, in 2008, before making demand is sufficient to demonstrate waiver. Respondents do not allege that KLC made any affirmative waiver of its right to half of the forfeited money under the Employment Contracts, and this Court does not deem KLC's silence, even if it knew that the Robertsons were spending the forfeited money, sufficient to show intent to waive.

12

<u>5. There is insufficient evidence to support the jury verdict that John Knipe violated the Idaho Consumer Protection Act, as alleged.</u>

Appellants argue that the district court erred in allowing the jury to rule on the ICPA claim against Knipe, as there was no evidence submitted at trial to support a claim for such an action, and Respondents failed to demonstrate that they had suffered an ascertainable loss of money or property as a result of any such purported conduct. Respondents counter that sufficient evidence was presented to the jury to support its finding that an ICPA violation occurred. Respondents' brief does not respond to the issue of "ascertainable loss."

Jury Instruction No. 20 reads:

> Richard and Johnnie Robertson and Robertson Kennels, Inc. have the additional burden of proving the following propositions on their claim that Knipe Land Company and John Knipe violated the Idaho Consumer Protection Act by:
> 1. Failing to deliver to Robertsons and Robertson Kennels, Inc. legible copies of the Employment Contracts at the time Robertsons and Robertson Kennels, Inc.'s signatures were obtained; and/or
> 2. Engaging in any act or practice which was otherwise misleading, false, or deceptive to Robertsons and/or Robertson Kennels, Inc.
> Richard and Johnnie Robertson and Robertson Kennels, Inc. also have the burden of proving that as a result of the violation they were damaged, and the amount thereof.

On the verdict form the jury found that Knipe had violated ICPA but made no such finding regarding KLC. The jury found that Respondents suffered $1,000 in damages as a result of this violation.

Idaho Code § 48-608(1) provides:

> Any person who purchases or leases goods or services and thereby *suffers any ascertainable loss of money or property, real or personal, as a result* of the use or employment by another person of a method, act or practice declared unlawful by this chapter, *may treat any agreement incident thereto as voidable **or, in the alternative**, may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is the greater*; provided, however, that in the case of a class action, the class may bring an action for actual damages or a total for the class that may not exceed one thousand dollars ($1,000), whichever is the greater. Any such person or class may also seek restitution, an order enjoining the use or employment of methods, acts or practices declared unlawful under this chapter and any other appropriate relief which the court in its discretion may deem just and necessary. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper in cases of repeated or flagrant violations.

(Emphases added).

13

Nothing in the verdict form submitted by the jury indicates what violation of ICPA the jury found that Knipe had committed. Again, employing the JNOV standard as provided in *Bates v. Selvin*, 146 Idaho at 774–75, 203 P.3d at 704–05, we shall consider whether any of the potential violations of ICPA provided in the jury instructions were supported by competent evidence such that a JNOV is inappropriate.

There was uncontested evidence submitted at trial that KLC provided Respondents with copies of the Employment Contracts at the time Respondents' signatures were obtained. As such the only possible violation that the jury could have found was that the copies provided were not legible. No party testified that the provided copies were illegible. Respondents submitted copies of the 2005 Employment Contract and the 2007 contract renewals into evidence but did not submit a copy of the 2007 Employment Contract. The copies submitted into evidence are clearly legible. As such we find that there was insufficient evidence submitted to instruct the jury on this potential violation of ICPA or to support the jury's verdict on that basis.

An examination of the trial transcript reveals one other possible violation of ICPA as alleged, and that is Knipe's decision not to make demand for KLC's share of the forfeited funds under either the Harmon Contract or MidAmerican Contracts until after Respondents renewed the Employment Agreements in 2008, as revealed in testimony concerning emails between Strain and Knipe.

In an email chain submitted into evidence, Strain writes to Knipe, regarding the demand of forfeited funds, "[l]et's not send that today. Let him [Richard Robertson] get out the contract and read first. If you send today—I am afraid that he will be furious and we will suffer our reputation. Why don't you wait for at least tomorrow." Strain later sent Knipe an email saying "Why don't you send it Monday? . . ." Knipe responded, "Ok sounds good." Respondents argue that this exhibit demonstrated that Knipe was withholding KLC's demand until after extensions of the Employment Contracts were obtained. The record demonstrates that Respondents did renew the Employment Contracts prior to receiving KLC's demand. However, Respondents immediately terminated the Employment Contracts upon receiving KLC's demand, and although Appellants initially sued over this termination, that claim was dropped prior to trial. Idaho Code § 48-608(1) specifically provides that a person suffering an ascertainable loss as a result of a fraudulent, misleading or deceptive act under ICPA, "may treat any agreement incident thereto as voidable *or*, *in the alternative*, may bring an action to recover actual damages or one thousand

14

dollars ($1,000), whichever is the greater." Having elected to treat the Employment Contracts as voidable, Respondents chose their remedy under I.C. § 48-608(1) and cannot also sue to recover actual damages. Therefore, we find that there was insufficient evidence to support the jury's verdict that Knipe violated ICPA, as alleged.

> 6. The district court erred in denying Appellants' motion for a JNOV.

As a matter of law, Respondents breached the Employment Contracts, and Knipe did not commit a violation of ICPA for which Respondents were entitled to damages. As there was insufficient evidence to support the jury's verdict, we reverse the district court's decision denying Appellants' motion for a JNOV and remand for an entry of judgment consistent with the views expressed in this opinion.

**B. The district court did not err in failing to grant summary judgment or a directed verdict to Respondents under the "*Ellsworth Dobbs* doctrine".**

It is well established in Idaho law that the denial of summary judgment is not an appealable issue. *Bowles v. Pro Indiviso, Inc*., 132 Idaho 371, 376, 973 P.2d 142, 147 (1999) ("[A]n order denying a motion for summary judgment is not a final order and a direct appeal cannot be taken from it. Moreover, an order denying a motion for summary judgment is not reviewable on appeal from a final judgment."). Therefore, we shall not consider Respondents' argument that the district court erred in not granting summary judgment on their behalf, but we will consider whether a directed verdict should have been entered.

Respondents argue that it is established law in Idaho, as adopted from the New Jersey case of *Ellsworth Dobbs, Inc. v. Johnson*, 236 A.2d 843, 855 (N.J. 1967), that real estate brokers are not entitled to compensation unless a real estate transaction closes. Appellants argue that this doctrine established under that case and its Idaho progeny is irrelevant, as those cases specifically deal with a "commission" on a sale, not division of funds in case of forfeiture.

In *Ellsworth Dobbs* the New Jersey Supreme Court rejected the traditional rule allowing a real estate broker to receive its commission when it produced a buyer who was ready, willing and able to purchase the seller's land, regardless of whether the transaction actually occurred. *Id*. at 855. Rejecting that rule, the Court found that a broker would not be entitled to a commission until the anticipated land sale was actually completed. *Id*. at 857–58. The Court also held that public policy prohibited brokers from contracting around the newly established rule, due in part to a concern over inequality in bargaining power between brokers and sellers. *Id*. at 858.

15

Respondents argue that *Margaret H. Wayne Trust v. Lipsky*, 123 Idaho 253, 846 P.2d 904, (1993) has facts "strikingly similar to the facts in the instant matter" and argues that a comparison reveals that public policy prevents Appellants from receiving half of the forfeited earnest money here. *Lipsky* involved the failed sale of a condominium and various remedies and damages related to that failed sale. The district court in *Lipsky* had awarded the property seller damages "for real estate commission due" to the seller's broker; even though there was no evidence that the seller had sought such damages. *Id*. at 259, 846 P.2d at 910. In reversing that award, this Court rejected the traditional test and adopted the reasoning of the *Ellsworth Dobbs* Court. *Id*. at 260, 846 P.2d at 911. In addition, this Court noted that a dispute between the buyer and broker had been settled prior to trial and such an issue was therefore extinguished. *Id*. Thus, the portion of *Lipsky* cited by Respondents dealt only with commission, and the issue itself was deemed extinguished prior to this Court hearing the issue, and it offers us no guidance in the matter at hand.

In summarizing the cases that they cite, Respondents replace the word "commission" with "compensation", describing the rule as requiring that "*compensation* only be paid where the purchaser completes the transaction by closing the title." However, Respondents fail to cite to a single case where the *Ellsworth Dobbs* doctrine was applied to compensation *other than commission* deemed to be due to the broker, where an anticipated sale did not occur. We hold that the contested provision of the Employment Contracts is not rendered unenforceable or against public policy under that doctrine.

**C. Other issues pertaining to the award and apportionment of attorney fees below.**

As we reverse the district court's denial of Appellants' motion for a JNOV, we vacate the award of attorney fees below in favor of Respondents, and as such the issue of apportionment of fees is moot. Likewise, this Court vacates the award of attorney fees to Respondents for post-trial actions and need not address Respondents' argument that the fees were improperly reduced.

**D. Neither party is entitled to attorney fees on appeal**.

Appellants included the issue of attorney fees in their division of issues on appeal, in compliance with I.A.R. 35(a)(5), but failed to address that request in their argument section, as required by I.A.R. 35(a)(6). Appellants similarly requested attorney fees as cross-respondent in their cross-respondent brief, where they stated attorney fees as an issue on appeal, in compliance with I.A.R. 35(b)(5), but failed to address that request in their argument section, as required by

I.A.R. 35(b)(6). Therefore, Appellants are not entitled to attorney fees. *See McVicker v. City of Lewiston*, 134 Idaho 34, 38, 995 P.2d 804, 808 (2000) ("The [appellants] requested attorney fees and costs on appeal in their statement of issues on appeal. The [appellants] did not, however, address the request in the argument section of their brief as required by I.A.R. 35(a)(6). The Court therefore declines to consider an award of fees.").

Respondents request attorney fees pursuant to I.C. § 12-120(3), 12-121 and I.A.R. 35(b)(5), I.A.R. 40 and I.A.R. 41(a), but as Respondents are not the prevailing party on appeal, they are not entitled to attorney fees.

## IV. CONCLUSION

We reverse the district court's denial of Appellants' motion for a judgment notwithstanding the verdict as to both the breach of contract claim, and the ICPA claim. We find that Respondents clearly breached the unambiguous Employment Contracts and there was insufficient evidence to support the jury's verdict that Knipe violated the Idaho Consumer Protection Act. We remand to the district court with instructions to enter a judgment notwithstanding the verdict in favor of Appellants and to make a determination of damages for the contractual breach, consistent with this opinion. We vacate the damages and attorney fees that were awarded to Respondents below and remand for a determination of whether attorney fees and costs should be awarded to Appellants for the proceedings below, consistent with this opinion. No attorney fees are awarded to either party on appeal. Costs to Appellants.

Chief Justice EISMANN and Justices J. JONES, W. JONES and HORTON, **CONCUR.**