# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 38480

GARY DUSPIVA dba GARY DUSPIVA )
WELL DRILLING & DEVELOPMENT, )
           )
    Plaintiff-Appellant, )
           )
v. )
           )
CLYDE FILLMORE an individual, and )
JOHN FILLMORE, an individual, )
           )
    Defendants-Respondents. )
_____ )

Boise, January 2013 Term

2013 Opinion No. 4

Filed: January 23, 2013

Stephen W. Kenyon, Clerk

_____

Appeal from the District Court of the Third Judicial District of the State of Idaho, Canyon County.  Hon. Thomas J. Ryan, District Judge.

The judgment of the district court is affirmed.

Sawtooth Law Offices, PLLC, Boise, for appellant. Daniel V. Steenson argued.

Moore Smith Buxton & Turcke, Chartered, Boise, for respondents. Bruce M. Smith argued.

_____

J. JONES, Justice.

Gary Duspiva, a well driller, initiated this suit against Clyde and John Fillmore to recover money that he claimed to be owing for well drilling services. The Fillmores counterclaimed, alleging Duspiva violated the Idaho Consumer Protection Act[1] (ICPA). The matter proceeded to a court trial. The district court found that Duspiva's conduct violated the ICPA and granted judgment in favor of the Fillmores. Duspiva appealed to this Court.

## I.
## FACTUAL AND PROCEDURAL HISTORY

Duspiva is the owner of Gary Duspiva Well Drilling & Development. Clyde Fillmore met with Duspiva on June 11, 2007, to discuss drilling a well. At the June 11 meeting between Duspiva and Clyde, the parties discussed the well location and the conditions of the drilling services. Clyde decided where the well would be located. Duspiva informed Clyde that the well would cost $32.50

_____
[1] I.C. § 48-601, *et seq.*

1

per foot of drilling, plus all incidental costs. Duspiva told Clyde that his allowance for sand in the well water was one pinch of sand per five gallons of water. Duspiva advised Clyde that he did not use sand screens in his wells, but he did not provide any explanation for his practice of not using screens. The parties did not execute a writing to memorialize this discussion.

On the same day, Duspiva met with John Fillmore to execute a Start Card Permit, an Idaho Department of Water Resources (IDWR) form that authorizes a well driller to commence drilling. The Start Card was filled out by Duspiva, signed by John, and submitted to IDWR by Duspiva. The Start Card permitted Duspiva to drill a "domestic well for a single-family residence." Further, the Start Card proposed a maximum well depth of 200 feet and required Duspiva to cease drilling and contact IDWR "if a bottom hole temperature of 85 F. or greater [is] encountered."

Duspiva began drilling on June 12, 2007. The district court described Duspiva's progress as follows:

> Gary Duspiva first hit water at 85 feet. Thereafter, he hit water at 128-131 feet and 148-153 feet. At each layer, he noted the presence of brown sand and fine brown sand. He next hit water at 320-348 feet. At this level, the temperature was 70 degrees and he noted the presence of 3 tablespoons of sand per 5 gallon bucket and a flow of 10 gallons per minute. He next hit water at 360-362 feet. At this level, the temperature was 77½ degrees and he noticed the presence of 2 teaspoons of sand per five gallon bucket and a flow of 12 gallons per minute. Mr. Duspiva continued to drill and next hit water at 580-585 feet and again at 642-650 feet, at 670 feet, at 691 feet, at 701 feet, and finally at 836 feet on or about August 8, 2007. With each development the temperature of the water increased. At approximately 600 feet the temperature of the water rose to 85 degrees and thereafter continued to increase and at 836 feet reached a temperature of 91½ degrees.

Upon encountering the 85 degree water at 600 feet, Duspiva did not cease drilling or contact IDWR.

On August 9, 2007, Duspiva informed Clyde that, while drilling, he encountered low temperature geothermal (LTG)[2] conditions. At this time the well had been drilled to a depth of 836 feet, but Duspiva had encountered LTG conditions at approximately 600 feet. Duspiva did not explain to the Fillmores the legal or monetary significance of reaching LTG conditions.[3] Duspiva

---

[2] Low temperature geothermal wells are those that have a bottom hole temperature more than 85 degrees F. and less than 212 degrees F. IDAPA 37.03.09.030.01. Low temperature geothermal wells are to be "utilized primarily for heat value and secondarily for the value as water. Usage of a [LTG] resource primarily for reasons other than heat value is not a beneficial use of the resource . . . ." I.C. § 42-233(1).

[3] Among other requirements:

> Any owner of a well who engages in the drilling, redrilling, modifying or deepening of any low temperature geothermal well shall file with the director of the department of water resources a

2

recommended that they continue to drill deeper or they would have to return to an upper level and would risk perforating the case and ruining the well. The Fillmores agreed to drill deeper. Also on August 9, Duspiva contacted IDWR and informed the department that he had encountered LTG conditions and that he wanted to drill deeper to complete the well.

On August 16, 2007, Duspiva presented John with an Application for Drilling Permit, which proposed a new well with a maximum depth of 1000 feet and an anticipated bottom hole temperature of 85 degrees to 212 degrees. The application was approved by IDWR on August 20, 2007, and Duspiva re-commenced drilling. On September 26, 2007, when Duspiva completed drilling, the well was 1130 feet deep and the water was 102 degrees.

On October 23, 2007, at a joint meeting with IDWR and Duspiva, the Fillmores first became aware of the ramifications of having an LTG well. Subsequently, the parties were unable to reach a resolution regarding completion of the well. Duspiva billed a total of $50,665 for his drilling and construction services. Clyde made two payments in the amount of $10,000, the first on August 3, 2007, and the second on September 13, 2007. On October 3, 2008, Duspiva filed suit against the Fillmores to recover the claimed balance of $30,665. The Fillmores filed a counterclaim with their Answer, seeking recovery for breach of contract/unjust enrichment and for violation of the ICPA.

While the case was awaiting trial, IDWR conducted an administrative proceeding to determine what course of action should be taken to address the Fillmores' unwanted LTG well. On November 6, 2008, IDWR issued a memorandum concluding that the well should be abandoned. That conclusion was reached due to the expiration of the drilling permit, the deteriorated relationship of the parties, and the unwillingness of Duspiva to provide any additional work to complete or abandon the well until he was paid in full. IDWR solicited bids from licensed well drillers to complete the closure of the well. Down Rite Well Drilling was selected to oversee the closure of the well. The Fillmores and Duspiva split the closure fee, approximately $13,000.

The Fillmores then hired Down Rite to drill a new domestic well on John's property. Down Rite drilled a productive domestic cold-water well forty feet from the original well site to a depth

surety bond or cash bond in the penal sum of not less than five thousand dollars ($5,000) or more than twenty thousand dollars ($20,000) as determined by the director of the department of water resources based on the temperature, depth and pressure of the resource, the size and depth of the well, and any other relevant factors.

I.C. § 42-233(3).

3

of 320 feet, using a filter pack and a screen, for approximately $18,000.

Prior to trial, the court addressed a Motion in Limine filed by Duspiva seeking to exclude the Fillmores' expert witness, Ed Squires,[4] on the grounds that his opinions were not timely disclosed. The court found merit in Duspiva's late disclosure argument, but ultimately held that Squires' testimony would help in educating the court on certain well drilling practices. Thus, the court held that Squires could testify in order to aid the court in understanding the evidence, but that Squires could not testify as to any opinions he had regarding Duspiva's conduct.

On August 23, 2010, the court trial commenced. The district court issued its Findings of Fact and Conclusions of Law on October 18, holding that Duspiva violated the ICPA and awarding the Fillmores actual damages in the amount of $27,500.[5] The Fillmores sought and the court granted an award of attorney fees under I.C. § 48-608(5). Duspiva timely appealed to this Court.

## II.
## ISSUES ON REVIEW

1. Did the district court err in finding that Duspiva's conduct violated the ICPA?
2. Did the district court cumulatively apply the alternative remedies of I.C. § 48-608(1)?
3. Did the district court err in allowing Ed Squires to testify as an expert witness?
4. Are the Fillmores entitled to attorney fees on appeal?

## III.
## DISCUSSION

### A. Standard of Review.

"In all actions tried upon the facts without a jury… the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment." I.R.C.P. 52(a). When reviewing a district court's decision after a trial without a jury:

> This Court reviews factual findings made after a trial without a jury for clear error. We will not disturb findings of fact that are supported by substantial and competent evidence, even if there is conflicting evidence. Substantial evidence is that which a reasonable trier of fact would accept and rely upon it in determining findings of fact. We freely review the district court's conclusions of law.

*Machado v. Ryan*, 153 Idaho 212, 217, 280 P.3d 715, 720 (2012) (citations omitted).

### B. The district court did not err in finding that Duspiva violated the ICPA.

The district court held that Duspiva violated I.C. § 48-603(16)-(18) by recommending and

---

[4] Squires is a Registered Professional Geologist in Idaho. He is also a Professional Well Log Analyst and a Certified Water Rights Examiner for IDWR.

[5] This amount included the two $10,000 payments made to Duspiva by Clyde and the $7,500 the Fillmores paid to Down Rite to close the LTG well.

providing services not needed, engaging in misleading or deceptive acts, and engaging in an unconscionable act. According to the court, "[t]he Fillmores had no reason to expect that they were bargaining for anything other than a cold water domestic well." The court noted that the Start Card initially allowed for a well which would not exceed 200 feet in depth and observed that "the greater the depth of the well, the greater the price that would be billed by Duspiva." The district court found there was no legitimate basis for Duspiva to drill the well to a depth reaching LTG conditions and that Duspiva nonetheless recommended that the well be drilled deeper "under the guise that there was too much sand in the water." The court noted that on two prior occasions—one in 2001, and the other in 2005—Duspiva had received verbal warnings from IDWR regarding violations concerning LTG wells, one of which was located only a few miles from the Fillmore well site. Additionally, just prior to commencing the Fillmore well, IDWR sent Duspiva a written warning for drilling an LTG well without prior authorization. Furthermore, the court found that uncontroverted evidence presented at trial illustrated that the use of screening techniques to filter sand were common practice in the industry and could have been employed at depths much shallower than Duspiva drilled to address the sand in the water.

On appeal, Duspiva argues that his conduct did not violate the ICPA. Duspiva asserts that the district court did not identify or apply the appropriate deception standard for determining whether the ICPA was violated. Duspiva claims this Court should only find deception under the ICPA if "there is a representation, omission or practice that is *likely* to mislead the consumer acting *reasonably* in the circumstance, to the consumer's *detriment*." Duspiva also argues that the district court did not make any finding, nor was any evidence produced to support a finding, that he knew or should have known that he was committing a deceptive act under I.C. § 48-603. Lastly, Duspiva argues that well drilling should not be subject to the ICPA because of the subjective professional judgment inherent in the practice, but he provides no authority to support the argument.

The Fillmores argue that the district court correctly found that Duspiva violated the ICPA because Duspiva hid critical information in order to drill deeper and charge more money. The Fillmores contend that Duspiva violated the ICPA by failing to inform them of the industry standard regarding the use of sand screens and by continuing to drill deeper even after he encountered cold water at shallower depths. The Fillmores acknowledge that they never told Duspiva to stop drilling, but claim they only authorized continued drilling based on Duspiva's professional recommendations.

5

The ICPA was enacted to protect consumers from "deceptive acts and practices in the conduct of trade or commerce." I.C. § 48-601. "[T]he ICPA defines what constitutes an unfair method of competition." *State ex rel. Wasden v. Daicel Chem. Indus., Ltd.*, 141 Idaho 102, 107, 106 P.3d 428, 433 (2005). Under I.C. § 48-603, deceptive acts or practices in the conduct of any trade or commerce are unlawful where a person knows, or in the exercise of due care should know, that he has in the past, or is:

> (16) Representing that services, replacements or repairs are needed if they are not needed, or providing services, replacements or repairs that are not needed;
> (17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer;
> (18) Engaging in any unconscionable method, act or practice in the conduct of trade or commerce, as provided in section 48-603C, Idaho Code . . .

I.C. § 48-603 (16)-(18). Beyond these legislative definitions of unfair competition, I.C. § 48-604 instructs that:

> It is the intent of the legislature that in construing [the ICPA] due consideration and great weight shall be given to the interpretation of the federal trade commission and the federal courts relating to section 5(a)(1) of the federal trade commission act (15 U.S.C. 45(a)(1)), as from time to time amended.

Section 5(a)(1) of the FTCA provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a)(1). "Federal case law as it has developed under this provision of the [FTCA], although not binding is persuasive in application of the [ICPA]." *State ex rel. Kidwell v. Master Distribs., Inc.*, 101 Idaho 447, 453, 615 P.2d 116, 122 (1980). In *Master Distributors,* this Court relied on federal law from multiple circuits to define "unfair practice" under the FTCA. The standard adopted was as follows:

> An act or practice is unfair if it is shown to possess a tendency or capacity to deceive consumers. The law is settled that a finding of tendency and capacity to mislead is sufficient and that actual deception need not be shown. Likewise, proof of intention to deceive is not required for finding that an act is unfair or deceptive.

*Id*. at 453–54, 615 P.2d at 122–23 (citations omitted).

Duspiva contends that federal law has shifted since this Court addressed 15 U.S.C. § 45(a)(1) in *Master Distributors*. According to Duspiva, under the current deception standard the Federal Trade Commission will only find deception "if there is a representation, omission or practice that is *likely* to mislead the consumer acting reasonably in the circumstances, to the consumer's *detriment*." Duspiva cites *Southwest Sunsites v. FTC*, 785 F.2d 1431, 1435−36 (9th

Cir. 1986), in support of this contention. Duspiva asserts that this deception standard sets a higher bar for proving a violation of the FTCA and it probably does. However, what Duspiva fails to mention is that he did not assert this standard in his briefing to the district court. This Court will not consider arguments raised for the first time on appeal. *McLean v. Cheyovich Family Trust*, 153 Idaho 425, 431, 283 P.3d 742, 748 (2012). Even if the revised FTCA standard applies here, Duspiva fails to offer convincing arguments that his conduct does not fit that standard. The district court found:

> After each update, Gary Duspiva would always recommend that the Fillmores continue to drill deeper. The Fillmores agreed to continue to drill deeper based upon Gary Duspiva's recommendation. The Fillmores were never provided with an alternative to drilling deeper. In particular, at no time were the Fillmores provided with the option of using a filter pack and screens.

Duspiva has not shown this finding to be unsupported by the evidence. The record before us discloses that Duspiva's conduct was likely to mislead the Fillmores, that they were acting reasonably in reliance upon Duspiva, and that they thereby suffered detriment.

In this case, the district court's conclusion that Duspiva violated the ICPA was proper. Based on the court's findings of fact, which are supported by substantial and competent evidence, it appears that Duspiva violated both subsections (16) and (17) of I.C. § 48-603 by misleading the Fillmores and providing the Fillmores with unneeded drilling services.[6]

Subsection (16) makes it unlawful to represent that services are needed if they are not. The court found that the Fillmores had bargained for a cold water domestic well. After Duspiva reached LTG conditions, it should have been clear to him that the Fillmores' objective could not be attained by drilling deeper. Nevertheless, he recommended that they continue drilling. The record indicates that no legitimate reason existed for doing so. Uncontroverted evidence was presented at trial that the use of screens was common industry practice to minimize sand in well water and that the use of a screen would have allowed Duspiva to drill a much shallower well at a lower cost while still producing water with minimal sand. The court below indicated that Duspiva's recommendation to drill deeper to limit sand was merely a "guise" to allow Duspiva to collect more money on the $32.50 per foot pricing scheme, which increased by $2.00 per foot

---

[6] The District court found that Duspiva violated I.C. § 48-603 (16)-(18). We agree with the district court's finding with respect to subsections (16) and (17). We do not believe the facts of this case support a finding that subsection (18) of I.C. § 48-603 was violated. However, because a single violation of any of the nineteen subsections of I.C. § 48-603 results in a violation of the ICPA, whether subsection (18) was violated in this case is irrelevant.

after reaching a depth of 400 feet. The record illustrates that drilling the well to a depth of 1130 feet was unnecessary and could have easily been avoided through the common and low cost use of a screen. Thus, Duspiva unlawfully represented that additional drilling services were needed, when in fact they were not.

Subsection (17) of I.C. § 48-603 makes it unlawful to engage in any act or practice that is misleading or deceptive to the consumer. Duspiva's conduct misled the Fillmores in two respects. First, the court found that Duspiva was substantially sure that drilling to depths of 1,000 feet would result in reaching LTG conditions. Duspiva nonetheless proceeded to drill to a depth of 1130 feet and did in fact reach LTG conditions along the way. During the drilling process, Duspiva continually misled and deceived the Fillmores by failing to communicate the likelihood of reaching LTG conditions, and the consequences, both monetary and regulatory, of drilling and owning an LTG well. The Fillmores only became aware of the regulatory consequences of maintaining an LTG well once Duspiva had completed the well. Further, the district court found that water at "LTG levels is not desirable for potable water supplies because the warm water promotes chemical reactions in groundwater, promotes bacteria, is aesthetically unpleasing, and carries dissolved gas and other reduced constituents." There is no question that the Fillmores wanted the well for domestic purposes. The district court noted, "the water found above the approximate 400 foot level is fresher, recharged readily, contains more oxygen, and is cooler."

C.   **The district court did not abuse its discretion by allowing Ed Squires to testify about the technical aspects of drilling; furthermore, Squires' testimony conformed with the court's pre-trial order.**

On August 19, 2010, the district court held a hearing to address Duspiva's Motion in Limine to Exclude Defendant's Expert Witness. At the hearing, the Fillmores' counsel indicated that Squires would testify about certain well drilling techniques and standards in the drilling industry, and would opine that the use of a screen and a filter pack in this case would have prevented the need to drill into an LTG region while still producing a cold water domestic well.

Counsel for Duspiva objected to Squires' testimony because the substance of his testimony was not timely disclosed. Responding to Duspiva's interrogatories, the Fillmores timely indicated that Squires would testify but did not indicate what he would testify about or the basis of his testimony until the morning of the hearing, three days before trial.

In ruling on the motion, the district judge found merit in Duspiva's late disclosure argument, especially regarding Squires' opinion testimony addressing Duspiva's potential

8

negligence. However, the district judge also felt that "Squires [had] the ability to give the court an education, not only that would benefit the defendants but also the plaintiff." Ultimately, the court held that Squires would be allowed to testify about the scientific and technical aspects of drilling, but that Duspiva could object at trial if Squires' testimony directly addressed Duspiva's conduct.

At trial, counsel for Duspiva again generally objected to Squires' testimony on the grounds that his opinions were not timely disclosed. The court overruled the objection and ruled that:

> [P]ursuant to Rule of Evidence 702 the court is allowing this expert to testify with regard to issues of scientific knowledge that this witness may have which might assist this court, this judge as the trier of fact, in understanding what it is to drill a well and some of the–and, quite frankly to give me an education on well drilling in general. But as the court previously ruled, he will not be allowed to give opinions specifically as to the conduct of Mr. Duspiva in this particular transaction with the–transaction, if there was one, with the Fillmores.

On appeal, Duspiva argues that Squires' testimony should have been excluded by the district court and that allowing Squires to testify constitutes reversible error. Duspiva argues that the Fillmores' counsel did not comply with I.R.C.P. 26(e) by failing to amend interrogatory responses to include the subject matter of Squires' testimony, and thus, he should not have been allowed to testify. In addition, Duspiva argues that even if the court properly allowed Squires to testify, his testimony did not conform to the limited scope the judge authorized. The Fillmores argue that Squires' testimony was consistent with the district court's pre-trial ruling and was properly admitted because it was helpful to the court in understanding issues related to well drilling.

### 1. Rule 26 did not require the district court to exclude Squires' testimony.

Rule 26 requires that parties seasonably supplement their discovery responses to any question directly addressed to "the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of the person's testimony." I.C.R.P. 26(e)(1)(B). "If a party fails to seasonably supplement the responses as required in this Rule 26(e), the trial court may exclude the testimony of witnesses or the admission of evidence not disclosed by a required supplementation of the responses of the party." I.R.C.P. 26(e)(4). Rule 26 "unambiguously imposes a continuing duty to supplement responses to discovery with respect to the substance and subject matter of an expert's testimony." *Radmer v. Ford Motor Co.*, 120 Idaho 86, 89, 813 P.2d 897, 900 (1991). However, "[w]hether to exclude undisclosed expert testimony pursuant to I.R.C.P. 26(e)(4) is committed to

the sound discretion of the trial court." *Schmechel v. Dille*, 148 Idaho 176, 180, 219 P.3d 1192, 1196 (2009). To determine whether the district court abused its discretion, this Court asks:

> (1) Whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason.

*Sirius LC v. Erickson*, 150 Idaho 80, 87, 244 P.3d 224, 231 (2010) (quotations omitted).

Here, the district judge did not abuse his discretion by allowing Squires to testify about scientific and technical information in order to educate the court. First, the district court recognized that the decision whether to allow Squires to testify was discretionary. The transcript of the pre-trial hearing is replete with statements from the judge indicating that he perceived that the scope of Squires' testimony, if any, was committed to the court's discretion. On multiple occasions, the court recognized the merits of Duspiva's late disclosure argument but ultimately decided that limiting Squires' opinion testimony would cure any potential prejudice. Second, the trial court acted within the boundaries of its discretion. Rule 26 states that "the trial court may exclude the testimony" of an expert not properly disclosed. I.R.C.P. 26(e)(4). The "may" in Rule 26 gives the trial court the ability to weigh the prejudice of undisclosed testimony versus the value of the testimony, but does not require exclusion of testimony not properly disclosed. Thus, the trial court acted within the bounds of its discretion. Third, the court carefully tailored its decision to allow Squires to testify. The judge, having looked at the pre-trial motions and briefing, realized that the technical aspects of well drilling would play a major role in the trial and that he needed "an education" in order to make an informed decision. Thus, the district court did not abuse its discretion by allowing Squires to testify and the court's pre-trial ruling was in conformity with I.R.C.P. 26.

### 2. Squires' testimony was within the scope of the district court's pre-trial order.

Duspiva's argument that Squires' testimony was outside the scope allowed by the court is without merit. In his briefing to this Court, Duspiva has not produced a single example from the trial court transcript that he identifies as improper "opinion testimony." Rather, the opinions that Duspiva is objecting to are those of the district court, which he claims were "inferred" from Squires' testimony. Essentially, Duspiva's argument is that by drawing conclusions from Squires' testimony, the court formed improper opinions–not that Squires ever offered any improper opinion testimony. However, drawing inferences from facts is precisely the duty that the district court is

10

charged with.

The trial testimony not only indicates that Squires stayed within the confines of the judge's pre-trial ruling, but it also indicates that the district judge and counsel for the Fillmores reminded Squires not to give his opinion regarding Duspiva's conduct in this particular case. For instance, shortly after Squires took the stand, the Fillmores' counsel stated:

> Mr. Squires, one thing. As part of some pretrial discussions that we had, we're not going to have you testify or offer any opinions with regard to Mr. Duspiva. And so as you go through these explanations, it would be helpful to helping us, the court and everyone else understand, but remember we talked about that, and please be conscious of that as you testify.

Moreover, Duspiva's counsel only objected to a single statement made by Squires in over 60 pages of trial testimony, and that objection was overruled. Thus, the trial transcript indicates that Squires stayed within the confines of the court's pretrial order.

### D.    The district court did not misapply I.C. § 48-608.

In the district court's Findings of Fact and Conclusions of Law, it expressly found that the Fillmores and Duspiva entered into an agreement whereby Duspiva would drill and develop a domestic well for the Fillmores at a cost of $32.50 per foot. The court also specifically addressed the available remedies under the ICPA. The court stated, "pursuant to I.C. 48-608, the Fillmores are entitled to consider their agreement with Duspiva to drill a well void. That code section also declares that they are entitled to an award of their actual damages." At no point did the district court void any agreement between Duspiva and the Fillmores, nor has Duspiva alleged that the Fillmores treated their agreement as void.

On appeal, Duspiva argues that the district court misapplied I.C. § 48-608 in two ways. First, Duspiva argues that the district court incorrectly found that the statutory option to void an agreement made it unnecessary for the court to determine whether there was an agreement at all. In support of this argument, Duspiva points to language from the court's Conclusions of Law where the court stated, "[t]hus, if the court finds a violation of the [ICPA], an analysis of whether or not a contract was formed between these parties is unnecessary as it may be treated as voidable." Second, Duspiva argues that the court incorrectly treated the alternative remedies provided in I.C. § 48-608 as cumulative.

The Fillmores argue that neither of Duspiva's arguments addressing the court's application of I.C. § 48-608 are tenable because they misconstrue the district court's actual findings. As to

11

Duspiva's first argument, the Fillmores contend that the district court did find the existence of a contractual relationship between the Fillmores and Duspiva to drill a cold water, domestic well of 200 feet at $32.50 per foot. Addressing Duspiva's second argument, the Fillmores contend that the district court's ruling simply acknowledges that the Fillmores would be entitled under the statute to treat any agreement with Duspiva as void.

In order to have standing under the ICPA, "the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively." *Taylor v. McNichols*, 149 Idaho 826, 846, 243 P.3d 642, 662 (2010). In addition, "[t]he ICPA specifically provides that a person suffering an ascertainable loss as a result of a fraudulent, misleading or deceptive act under ICPA, 'may treat any agreement incident thereto as voidable *or, in the alternative,* may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is the greater.'" *Knipe Land Co. v. Robertson*, 151 Idaho 449, 460, 259 P.3d 595, 606 (2011) (quoting I.C. § 48-608(1)). Thus, if a plaintiff elects to treat the agreement upon which its ICPA claim is based as void, the plaintiff cannot then seek actual damages from the trial court as well. *Id.*

In this case, the district court properly invoked and applied the alternative damages provision of I.C. § 48-608(1). At the outset, it should be noted that the district court's statement that "if the court finds a violation of the [ICPA], an analysis of whether or not a contract was formed between these parties is unnecessary as it may be treated as voidable" is likely a misstatement of the law. However, the court's misstatement is irrelevant in this case because the court properly analyzed and applied I.C. § 48-608(1) in the remainder of its ruling.

In the district court's Conclusions of Law it expressly found that Duspiva and the Fillmores entered into an agreement for the drilling and development of a domestic well, giving the Fillmores standing under I.C. § 48-608. Moreover, the district court did not treat the alternative remedies of I.C. § 48-608 as cumulative. Although the court found that the Fillmores would be "entitled" to consider their agreement with Duspiva void, the court did not actually void any agreement. The court's ruling merely acknowledges that the Fillmores would be entitled, under the statute, to treat any agreement with Duspiva as void. In this case, the Fillmores did not treat the agreement as void, they sought their alternative remedy under I.C. § 48-608 for actual damages, which the court granted. Thus, the court below did not erroneously treat the remedies in I.C. § 48-608 as cumulative.

### E.     Attorney Fees

On appeal, the Fillmores request attorney fees and costs under I.C. § 48-608(5).[7] The Fillmores argue that they are entitled to fees and costs "because this appeal has no valid foundation and is unreasonable." Duspiva makes no responsive argument to the Fillmores' contention that they are entitled to attorney fees and costs on appeal.

The Fillmores' argument for attorney fees is predicated on the ICPA, specifically I.C. § 48-608, which provides:

> Costs shall be allowed to the prevailing party unless the court otherwise directs. In any action brought by a person under this section, the court shall award, in addition to the relief provided in this section, reasonable attorney's fees to the plaintiff if he prevails. The court in its discretion may award attorney's fees to a prevailing defendant if it finds that the plaintiff's action is spurious or brought for harassment purposes only.

I.C. § 48-608(5).

Under I.C. § 48-608(5) a party who invokes the protection of the ICPA and prevails is entitled to reasonable attorney fees based on an application of the prevailing party analysis from I.R.C.P. 54(d)(1)(B). *Israel v. Leachman*, 139 Idaho 24, 27, 72 P.3d 864, 867 (2003).

In this case, the Fillmores raised a counterclaim against Duspiva predicated on the ICPA. The Fillmores prevailed on their claim both at the district court and on appeal to this Court. Thus, the Fillmores are entitled to an award of attorney fees under I.C. § 48-608(5).

## IV.
## CONCLUSION

The judgment of the district court is affirmed. The Fillmores are awarded their costs and attorney fees on appeal.

Chief Justice BURDICK, and Justices EISMANN, W. JONES, and HORTON CONCUR.

---

[7] The Fillmores' briefing incorrectly cites to Subsection (4) of I.C. § 48-608, which, since the statute was amended in 2008, no longer provides for an award of attorney fees. However, counsel for the Fillmore's assured the Court at oral argument that this error was merely clerical. Given the clerical nature of this error, teamed with the fact that I.C. § 48-608 has only one subsection addressing attorney fees–preventing confusion–the Court will still entertain the Fillmores' request for fees under the ICPA.