# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket 42772

IN THE MATTER OF THE )
DISTRIBUTION OF WATER TO WATER )
RIGHT NOS. 36-02551 & 36-07694 )
(RANGEN, INC.) IDWR DOCKET CM-DC- )
2011-004. )
 )
RANGEN, INC., )
 )
     Petitioner-Appellant, )
 )
v. )
 )
THE IDAHO DEPARTMENT OF WATER )
RESOURCES, GARY SPACKMAN, in )
his capacity as Director of the Idaho )
Department of Water Resources, )
FREMONT- MADISON IRRIGATION )
DISTRICT, and THE CITY OF )
POCATELLO, )
 )
     Respondents-Respondents, )
 )
and )
 )
IDAHO GROUND WATER )
APPROPRIATORS, INC.,  A&B )
IRRIGATION DISTRICT, BURLEY )
IRRIGATION DISTRICT, MILNER )
IRRIGATION DISTRICT, NORTH SIDE )
CANAL COMPANY, TWIN FALLS CANAL )
COMPANY, AMERICAN FALLS )
RESERVOIR DISTRICT #2, and )
MINIDOKA IRRIGATION DISTRICT, )
 )
     Intervenors-Respondents. )

Boise, December 2015 Term

2016 Opinion No. 21

Filed: February 29, 2016

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Twin Falls County.  Hon. Eric J. Wildman, District Judge.

The decision of the district court is <u>affirmed</u>.

Brody Law Office, PLLC, Rupert, Haemmerle Law Office, PLLC, Hailey, and

May, Browning and May, PLLC, Boise, for appellant Rangen, Inc. Robyn M. Brody argued.

Honorable Lawrence G. Wasden, Idaho Attorney General, Boise, for respondents Idaho Department of Water Resources and Gary Spackman. Garrick L. Baxter argued.

Racine Olson Nye Budge & Bailey, Chartered, Pocatello, for respondent Idaho Ground Water Appropriators, Inc. Thomas J. Budge argued.

White & Jankowski LLP, Denver, and A. Dean Tranmer, Pocatello, for respondent City of Pocatello. Mitra M. Pemberton argued.

Rigby, Andrus & Rigby Law, PLLC, Rexburg, for intervenor Fremont-Madison Irrigation District.

Barker, Rosholt & Simpson, LLP, Twin Falls, for intervenors A&B Irrigation District, Burley Irrigation District, Milner Irrigation District, North Side Canal Company and Twin Falls Canal Company.

Fletcher Law Office, Burley, for intervenors American Falls Reservoir District #2 and Minidoka Irrigation District.

————————————————

J. JONES, Chief Justice

Appellant Rangen, Inc., initiated a contested case by filing a petition for a delivery call before the Director of the Idaho Department of Water Resources ("IDWR"), alleging that junior ground water pumping in the Eastern Snake Plains Aquifer ("ESPA") was materially injuring its water rights. Several parties intervened in the delivery call and, after extensive discovery and communications, IDWR Director Gary Spackman ("Director") presided over an evidentiary hearing. The Director subsequently issued a final order and an order on reconsideration. In these orders the Director granted Rangen a curtailment of certain junior priority ground water pumping affecting Rangen's water rights. The Director also interpreted the source and point of diversion elements of Rangen's water rights to have a scope smaller than Rangen's actual historical use.

Rangen and intervenor Idaho Ground Water Appropriators, Inc. ("IGWA") each filed petitions for judicial review. The issues raised by IGWA in its petition for judicial review are not at issue in the present proceeding. Rangen raised various issues related to the interpretation of its water rights and the sufficiency of the evidence before the agency. Specifically, Rangen appealed

2

the Director's determinations that Rangen may divert water only from the mouth of the Martin-Curren Tunnel and only within the ten-acre tract listed on its water right partial decrees. Rangen also appealed the Director's adoption of an adverse expert's analysis and the Director's conclusion that junior priority ground water users are using water efficiently and without waste.

The district court affirmed the Director's orders with respect to each of the issues that are on appeal before the Court in the present proceeding. Rangen appealed to this Court on substantially the same issues with substantially the same arguments.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

**A.     Rangen's Facilities and the Eastern Snake Plains Aquifer**

Rangen owns and operates a fish research and propagation facility at the head of Billingsley Creek in the Thousand Springs area near Hagerman, Idaho. The facility includes concrete channels for fish rearing ("raceways"), a hatch house, ponds for fish rearing and holding, and a greenhouse. East of the Rangen facility, water emanates from several springs on talus slopes just below a canyon rim. Water also emanates from the Martin-Curren Tunnel, commonly referred to as the Curren Tunnel. The Curren Tunnel is a large, excavated conduit constructed high on the canyon rim that extends 300 feet into the canyon wall.

A concrete collection box referred to as the "Farmers' Box," located near the mouth of the Curren Tunnel, collects water for delivery via pipelines to Rangen and holders of senior priority irrigation water rights. Currently, only Rangen diverts from the Farmers' Box, but senior priority irrigation water right holders may call for delivery of water from the Curren Tunnel in the future. Farther down the slope is a second concrete collection box referred to as the "Rangen Box." Rangen diverts water from the Farmers' Box to the Rangen Box through two plastic tubes. Water is then diverted from the Rangen Box through a steel pipe to raceways. Water can also be spilled out the side of the Rangen Box and returned to the talus slope. Water from the talus slope forms the headwaters of Billingsley Creek. The main diversion for the large raceways is downstream from the talus slope and is commonly referred to as the "Bridge Diversion." This diversion collects and diverts spring flows from the talus slopes, including water spilled from the Rangen Box.

Rangen holds five water rights for the Rangen facility which were decreed through the Snake River Basin Adjudication ("SRBA"). Rangen's petition for delivery call alleged injury

3

only to water rights nos. 36-02551 and 36-07694. Water right no. 36-02551 authorizes a diversion of 48.54 cfs for fish propagation and has a priority date of July 13, 1962. Water right no. 36-07694 authorizes a diversion of 26.0 cfs for fish propagation and has a priority date of April 12, 1977. The source element for water rights nos. 36-02551 and 36-07694 is the Martin-Curren Tunnel. The point of diversion element for these water rights is the ten-acre tract identified as SESWNW T07S R14E S32.

The ESPA is the aquifer underlying the Eastern Snake Plain. The ESPA is about 170 miles long and 60 miles wide, and is defined as an area having a common ground water supply. IDAPA 37.03.11.050. The ground water in the ESPA is hydraulically connected to the Snake River and tributary springs, including the Thousand Springs area where the Curren Tunnel is located. The ESPA is highly productive and is composed predominantly of fractured quaternary basalt, which is generally characterized by high hydraulic conductivity. The amount of water that discharges from the aquifer to hydraulically connected surface water sources is largely dependent on ground water elevations and hydraulic conductance. From October 1980 through September 2008, average annual discharge from the ESPA exceeded average annual recharge by 270,000 acre-feet, which resulted in declining aquifer water levels and declining discharge to the Snake River and tributary springs. Rangen claims that it is not receiving all of the water to which it is entitled under its water rights because of junior ground water pumping in the ESPA.

B.      Rangen's Delivery Call

On December 13, 2011, Rangen, Inc. filed a petition for delivery call alleging that junior priority ground water pumping in the ESPA was materially injuring its water rights and requested that the Director distribute water in the ESPA and curtail junior priority pumping. IGWA and a number of other parties intervened in the proceeding,[1] while Pocatello and Fremont-Madison Irrigation District were brought in as respondents.

Prior to the hearing on the delivery call, Rangen moved for partial summary judgment, asking the Director to rule that the source of its water rights was not limited to the mouth of the Martin-Curren Tunnel but instead extended to the greater spring complex supplying the facility. Rangen also sought a ruling that it is entitled to divert water via the Bridge Diversion, despite the fact that the structure is not within the decreed ten-acre tract. The Director ruled that Rangen is

---

[1] A&B Irrigation District, American Falls Reservoir District #2, Burley Irrigation District, Milner Irrigation District, Minidoka Irrigation District, North Side Canal Company and Twin Falls Canal Company (collectively the "Surface Water Coalition") also intervened in the proceeding.

not authorized to divert water outside the decreed ten-acre tract, but that material issues of fact precluded summary judgment on whether Rangen's water rights extended to the entire spring complex.

The Director presided over an evidentiary hearing on Rangen's delivery call, held from May 1 through May 16, 2013. The Director issued an order on January 29, 2014, mandating curtailment of ground water rights bearing priority dates after July 13, 1962, with points of diversion located both within the area of common ground water supply and west of the Great Rift.

### C. The Curtailment Order

Rangen has measured the water flows through its facility since 1966. Since 1995, Rangen has been required by IDWR to report flow measurements annually to the watermaster of its water district. At the hearing before the Director, parties contesting the delivery call argued that Rangen had historically under-measured its flows and that the United States Geological Survey ("USGS") flow measurements were more representative of actual water flows through the Rangen facility. In his findings of fact, the Director compared Rangen's measurements with the USGS measurements and concluded that Rangen's measurements were inaccurate and resulted in a systematic underreporting of water flows. The Director relied on testimony by Greg Sullivan, an expert witness retained by Pocatello, who estimated that the error in Rangen's measurements was 15.9%, based on a comparison with USGS measurements taken between 1980 and 2012.

However, the Director found that even when applying the 15.9% margin of error, the spring flows in the area of the Curren Tunnel declined significantly from 1966 to 2012, with the annual flow decreasing from 32.1 cfs in 1966 to 4.4 cfs in 2011. The Director concluded that several factors contributed to the decline in water flow to the Rangen facility, including ground water pumping in the ESPA. The Director found this to be true even though he also found that testimony presented at the hearing showed that the junior-priority holders were using their appropriated water efficiently and without waste.

The technical model the Director relied on in this matter, ESPAM 2.1, simulates the effects of ground water pumping on spring flows throughout the region, including to springs located within a specific model cell. The Rangen model cell includes both water discharging from the Curren Tunnel and water discharging from the other springs within the same cell.

Rangen argued that although its partial decrees for water rights nos. 36-02551 and 36-07694 both state that the source for the right is the Martin-Curren Tunnel, the source actually includes the entire spring complex. The Director concluded that the source in the decree was limited to the flow from the mouth of the Curren Tunnel. Additionally, the Director reiterated his conclusion on summary judgment that, under the terms of the partial decrees, Rangen was not entitled to divert water from the Bridge Diversion because it was not within the decreed point of diversion.

ESPAM 2.1 is not precise enough to differentiate between water flowing from the Curren Tunnel and water flowing from the rest of the spring complex. Because the Director concluded that Rangen's water rights are limited to water diverted from the tunnel mouth, the Director considered the historical relationship between the Curren Tunnel and the total spring complex discharge to predict the portion of curtailed water that will accrue to the Curren Tunnel versus the Rangen model cell as a whole. Pocatello's expert witness Sullivan plotted data for measured Curren Tunnel flows and total spring flows and developed a linear regression analysis. Sullivan initially found that 75% of the curtailment benefits accruing to the model cell would accrue to the Curren Tunnel. However, this analysis was based on Rangen's measurements, which the Director found were underreported by 15.9%. After accounting for this error, Sullivan's revised analysis showed that 63% of the curtailment benefits accruing to the model cell accrued to the Curren Tunnel. The Director adopted Sullivan's 63/37 regression analysis and concluded that 63% of the water that would accrue to the Rangen cell would accrue to the Curren Tunnel.

### D.    Proceedings on Judicial Review

IGWA, Rangen, and Pocatello sought reconsideration of the Director's order. The Director issued an Order on Reconsideration denying IGWA's and the City of Pocatello's motions and granting in part and denying in part Rangen's motion.

Rangen and IGWA filed petitions for judicial review of the Director's order in Idaho's Fifth Judicial District. The district court granted motions to intervene filed by Pocatello, the Fremont-Madison Irrigation District, and the Surface Water Coalition and the petitions were consolidated. The district court affirmed the Director's order with respect to the issues raised in this appeal. Rangen timely appealed. The district court's dispositions of other issues in this case were appealed separately and are not further discussed in this opinion.

## II.
## ISSUES PRESENTED ON APPEAL

1. Whether the Director erred in concluding that Rangen is entitled to divert water only from the mouth of the "Martin-Curren Tunnel" and only within the ten-acre tract described in its partial decrees.

2. Whether there is substantial evidence to support the Director's adoption of Sullivan's 63/37 regression analysis.

3. Whether there is substantial evidence to support the Director's conclusion that junior priority ground water users are using water efficiently and without waste.

4. Whether any party is entitled to attorney fees on appeal.

## III.
## STANDARD OF REVIEW

In an appeal from a district court where the court was acting in its appellate capacity under the Idaho Administrative Procedure Act ("IDAPA"), "we review the decision of the district court to determine whether it correctly decided the issues presented to it." *Clear Springs Foods v. Spackman*, 150 Idaho 790, 797, 252 P.3d 71, 78 (2011). However, we review the agency record independently of the district court's decision. *Spencer v. Kootenai Cnty.*, 145 Idaho 448, 452, 180 P.3d 487, 491 (2008). A reviewing court "defers to the agency's findings of fact unless they are clearly erroneous," and "the agency's factual determinations are binding on the reviewing court, even when there is conflicting evidence before the agency, so long as the determinations are supported by substantial competent evidence in the record." *A & B Irrigation Dist. v. Idaho Dep't of Water Res.*, 153 Idaho 500, 505–06, 284 P.3d 225, 230–31 (2012). Substantial evidence is "relevant evidence that a reasonable mind might accept to support a conclusion." *In re Idaho Dep't of Water Res. Amended Final Order Creating Water Dist. No. 170*, 148 Idaho 200, 212, 220 P.3d 318, 330 (2009) (quoting *Pearl v. Bd. of Prof'l Discipline of Idaho State Bd. of Med.*, 137 Idaho 107, 112, 44 P.3d 1162, 1167 (2002)). The Court is bound by an agency's factual determinations "even where there is conflicting evidence before the agency, so long as the determinations are supported by substantial competent evidence in the record." *Eddins v. City of Lewiston*, 150 Idaho 30, 33, 244 P.3d 174, 177 (2010). "This Court freely reviews questions of law." *Vickers v. Lowe*, 150 Idaho 439, 442, 247 P.3d 666, 669 (2011).

The district court must affirm the agency action unless it

> finds that the agency's findings, inferences, conclusions, or decisions are:
> (a) in violation of constitutional or statutory provisions;
> (b) in excess of the statutory authority of the agency;
> (c) made upon unlawful procedure;

(d) not supported by substantial evidence on the record as a whole; or

(e) arbitrary, capricious, or an abuse of discretion.

I.C. § 67-5279(3); *Clear Springs Foods*, 150 Idaho at 796, 252 P.3d at 77. Even if one of these conditions is met, "[a]n agency action shall be affirmed unless substantial rights of the appellant have been prejudiced." I.C. § 67-5279(4). "If the agency action is not affirmed, it shall be set aside, in whole or in part, and remanded for further proceedings as necessary." I.C. § 67-5279(3).

## IV.
## ANALYSIS

**A.      The Director did not err in concluding that Rangen is entitled to divert only the water discharging from the mouth of the Martin-Curren Tunnel and only within the ten-acre tract described in its partial decrees.**

Rangen's two water rights at issue in this case were adjudicated in the SRBA. The Director concluded that, under Idaho Code section 42-1420, a decree entered in a general adjudication such as the SRBA is conclusive as to the nature and extent of the water right. Rangen's partially decreed water rights nos. 36-02551 and 36-07694 specify the source of its water under those licenses as "MARTIN-CURREN TUNNEL[;] TRIBUTARY: BILLINGSLEY CREEK." Each partial decree describes the same ten-acre tract as the only authorized point of diversion. It is undisputed that the Bridge Diversion lies outside the decreed tract. On summary judgment, the Director concluded that Rangen's partially decreed water rights were unambiguous with respect to the point of diversion element and that Rangen is not authorized to divert water outside the decreed ten-acre tract. After the evidentiary hearing, the Director concluded again that the point of diversion element of the partial decrees was unambiguous, while also concluding that the source element was unambiguous. Accordingly, the Director concluded that the partial decrees limit Rangen to diverting water only from the Martin-Curren Tunnel and only within the decreed tract. Thus, notwithstanding its historical use, Rangen is not entitled to divert water from the entirety of the spring complex and is not entitled to divert water at the Bridge Diversion.

Rangen contends that the Director erred in interpreting its partial decrees. It argues that the source element in its partial decrees is ambiguous and that in the relevant context "Martin-Curren Tunnel" refers to the entire spring complex comprised of Curren Tunnel plus the other springs scattered across the canyon wall. Additionally, Rangen argues that it should be entitled to divert water via the Bridge Diversion because the dam is "part of a diversion structure that lies

8

partially within the [decreed] ten acre tract."[2] Rangen further contends that the doctrine of quasi-estoppel precludes the Director from interpreting its partial decrees in a manner inconsistent with Rangen's historical use of water.

The Director rejected each of Rangen's arguments. He found that the name Martin-Curren Tunnel is not ambiguous and does not create a latent ambiguity in the partial decree. He further found that because the SRBA decrees list the point of diversion as SESWNW Sec. 32, T7S, R14E, Rangen is restricted to diverting water that emits from the Curren Tunnel in that ten-acre tract. The Director additionally found that equitable estoppel is inapplicable as it may not ordinarily be invoked against a government or public agency functioning in a sovereign or governmental capacity.

The district court affirmed the Director's conclusions on each of these issues, applying substantially the same legal reasoning as the Director. The district court further found that Rangen's attempt to reinterpret its water rights constitutes an impermissible collateral attack on the decrees. The district court asserted that any challenges to the facially plain language of Rangen's partial decrees needed to be raised in the SRBA forum. According to the district court, allowing Rangen to contest its partial decrees outside the SRBA would undermine any certainty or finality of those decrees. The district court also found that quasi-estoppel did not apply here because no exigency warranted the application of the doctrine against the Director in the exercise of his governmental functions and because Rangen had not established that the required elements were satisfied.

1.  **This proceeding is not an appropriate forum to reinterpret the scope of Rangen's partial decrees entered in the SRBA.**

By statute, "decree[s] entered in a general adjudication shall be conclusive as to the nature and extent of all water rights in the adjudicated water system." I.C. § 42-1420(1). In 1997, Rangen's water rights numbers 36-02551 and 36-07694 were adjudicated and partial decrees were entered in the SRBA. When Rangen applied to have its water rights entered in the SRBA, it requested identifying the source of each right as "Curran Tunnel" and describing the point of diversion of each right as a particular forty-acre tract. Rather than recommending that Rangen's water rights be decreed precisely as Rangen had requested, the IDWR Director at the time instead recommended identifying the source as "Martin-Curren Tunnel" and describing the point

---

[2] IDWR claims that Rangen applied in February of 2014 for approval to divert water from the Bridge Diversion and that IDWR approved the request and issued Permit 36-17002 to that effect. That permit has a priority date in 2014.

of diversion as the ten-acre tract in which the tunnel sits. Rangen did not file an objection to the Director's recommendations. The presiding judge of the SRBA entered partial decrees consistent with the Director's recommendations. Rangen neither appealed nor moved to set aside either partial decree in the SRBA.[3]

In the agency action on review here, the Director determined that

> Rangen's SRBA decrees do not identify Billingsley Creek as a source of water and do not include a point of diversion in the SWSWNW Sec. 32, T7S, R14E. . . . Administration must comport with the unambiguous terms of the SRBA decrees. Because the SRBA decrees identify the source of the water as the Curren Tunnel, Rangen is limited to only that water discharging from the Curren Tunnel. Because the SRBA decrees list the point of diversion as SESWNW Sec. 32, T7S, R14E, Rangen is restricted to diverting water that emits from the Curren Tunnel in that 10-acre tract.

On review, the district court concluded that if Rangen disagreed with how its water rights were recommended and ultimately decreed, it had an opportunity and responsibility to voice its concerns in the appropriate forum—the SRBA. The district court reasoned that this was necessary because the SRBA is a forum where all parties to the adjudication would have been afforded appropriate notice of Rangen's arguments and been given the opportunity to respond.

One purpose of the SRBA is "to establish . . . a uniform description for surface water rights, ground water rights and water rights which include storage." I.C. § 42-1427. "Conjunctive management of ground water and surface water rights is one of the main reasons for the commencement of the Snake River Basin Adjudication." *A & B Irrigation Dist. v. Idaho Conservation League*, 131 Idaho 411, 422, 958 P.2d 568, 579 (1997) (quoting 1994 INTERIM LEG. COMM. REP. ON THE SNAKE RIVER BASIN ADJUDICATION 36–37 (1994)). The quoted Committee Report continued: "The SRBA should determine the ultimate source of the ground and surface water rights being adjudicated. This legal determination must be made in the SRBA . . . If the SRBA proceeds and these issues are not addressed, a major objective for the adjudication will not have been served." *Id.* Further, as the district court in the present case held, allowing a party to contest a partial decree outside of the SRBA would undermine any certainty or finality of the partial decree.

---

[3] Rangen did move to file a late claim in the SRBA on April 19, 2013—more than fifteen years after its partial decrees were entered. Rangen's motion was denied as untimely, given that the deadline to file late claims in the SRBA lapsed January 13, 2013.

Rangen argues that it is disputing the Director's interpretation of the partial decrees rather than the partial decrees themselves. But this is a distinction without a difference. Any interpretation of Rangen's partial decrees that is inconsistent with their plain language would necessarily impact the certainty and finality of SRBA judgments and, therefore, requests for such interpretations needed to be made in the SRBA itself.

The district court found that Rangen's argument was based on the idea that the decrees do not accurately reflect its historical beneficial use. The court held that this argument was an impermissible collateral attack on the decrees. This Court agrees and affirms the district court's holding that Rangen's partial decrees entitle it to divert only that water emanating from the Martin-Curren Tunnel and only within the decreed ten-acre tract. If Rangen wanted its water rights to be interpreted differently, it should have timely asserted that in the SRBA.

### 2. Rangen is not entitled to divert water via the Bridge Diversion.

Rangen asserts that it should be permitted to use the Bridge Diversion because it is part of a diversion structure that lies mostly within the ten-acre tract described in the partial decrees. More specifically, Rangen argues that the Farmers' Box, Rangen Box and the Bridge Diversion are all integral parts of the same diversion structure. Rangen also seems to argue that it was required to identify the single ten-acre tract nearest to the point of diversion. The district court found that the Bridge Diversion is a separate and distinct diversion structure that is not physically connected to the Farmers' Box or the Rangen Box. Rangen's arguments on appeal here mirror its arguments before the district court.

Rangen offers no authority supporting the proposition that physically separate and distinct diversion structures may be regarded as components of a larger diversion structure. Absent citation to any such authority, this Court rejects the concept of diversion structure that Rangen urges. Logically, if separate and distinct individual diversion structures in different tracts were treated as a single diversion structure, any water right holder could claim an entitlement to divert water in any tract, as long as at least one component of one diversion structure were sited in a decreed tract. This approach would render the point of diversion element of a water right meaningless.

Rangen's argument that when it applied for its water rights in the SRBA it was required to list the single nearest ten-acre tract is also unavailing. The IDWR rule in effect at the time required an applicant to describe the location of the point of diversion to the nearest forty-acre

11

tract, while encouraging description to the nearest ten-acre tract "if that description is reasonably available." IDAPA 37.03.01.060.05.d.i. (7-1-93). The rule also provided that a water right holder could file multiple claims if it wanted to register multiple points of diversion. IDAPA 37.03.01.060.05.d.iii. (7-1-93). Thus, there was no requirement that Rangen's partial decrees be entered listing a single ten-acre tract as the point of diversion. Because the Bridge Diversion lies outside the specified point of diversion in its partial decrees, the water rights at issue here do not entitle Rangen to divert water via the Bridge Diversion.

### 3. Rangen has not established an ambiguity in its partial decrees.

Even if this were an appropriate forum to litigate the interpretation of Rangen's partial decrees, Rangen has not established a latent ambiguity sufficient to warrant reversal of the Director's conclusion regarding the source elements of its partial decrees.

Idaho courts interpret water decrees using the same interpretation rules that apply to contracts. *A & B Irrigation Dist.*, 153 Idaho at 523, 284 P.3d at 248. "Whether an ambiguity exists in a legal instrument is a question of law, over which this Court exercises free review." *Knipe Land Co. v. Robertson*, 151 Idaho 449, 455, 259 P.3d 595, 601 (2011). Ambiguity may be either patent or latent. *Id.* "A latent ambiguity exists where an instrument is clear on its face, but loses that clarity when applied to the facts as they exist." *Id.* Idaho law permits "[f]irst, the introduction of extrinsic evidence to show that the latent ambiguity actually existed; and, second, the introduction of extrinsic evidence to explain what was intended by the ambiguous statement." *Snoderly v. Bower*, 30 Idaho 484, 487, 166 P. 265, 265 (1917). Interpreting an ambiguous term is an issue of fact. *Knipe Land Co.*, 151 Idaho at 455, 259 P.3d at 601 (citing *Potlatch Educ. Ass'n v. Potlatch School Dist. No. 285*, 148 Idaho 630, 633, 226 P.3d 1277, 1280 (2010)).

Rangen argues that the terms "Martin-Curren Tunnel," "Curran Tunnel," and "Curran Spring(s)" are used interchangeably to describe the actual tunnel structure as well as the springs that emanate from the pipe and the talus slope below it. Rangen cites the testimony of its former long-term employee Lynn Babbington in support of this proposition.[4] Rangen also cites the testimony of another Rangen employee, Lonny Tate, who asked counsel to "classify 'the Curren Tunnel'" when asked about it on cross-examination. Rangen suggests this indicates that

---

[4] In response to the question "[w]hat did you understand was the Curren Tunnel?" Babbington responded:
> the Curren Tunnel was the – up on the hillside, a tunnel there. But it was known to me to be all of the – all of the water up there. Whether it be called Curren Tunnel or head of Billingsley Creek or Curren Springs, they were all – all meant the same thing. It was the -- all the springs that was a source to the hatchery.

clarification was necessary because of a latent ambiguity. Finally, Rangen refers to the back file for its 1977 water right license number 36-07694. The first page of the license specifies the source of the right as "springs tributary to Billingsley Creek" and the second page includes an annotation indicating "[s]ource known locally as Curran Tunnel." In the "source" field, Rangen's contemporaneous application for the 1977 water right had "underground springs" typewritten and "Curran Tunnel" handwritten above it. Rangen concludes that this evidence establishes a latent ambiguity, and it asserts in subsequent argument that the evidence in the record requires resolving the ambiguity in its favor. Intervenor IGWA suggests that "underground springs" can reasonably describe the tunnel because it is a human-made conduit bringing water to the surface from underground springs but that it cannot reasonably describe the other springs on the canyon wall because those are above-ground springs and not "underground springs."

In rejecting Rangen's ambiguity arguments, the Director relied on hearing testimony from Frank Erwin, who has served for sixteen years as the watermaster in the water district in which Rangen sits. Erwin, who was in a position to know whether the term "Martin-Curren Tunnel" had more than one meaning, distinguished "Curren Tunnel" from "Curren Spring" and displayed no confusion or uncertainty regarding what each term referenced. The Director also noted that if Rangen truly believed that Martin-Curren Tunnel was the common name for the entire spring complex, Rangen should have sought and had its water right decreed with additional points of diversion because the entire spring complex stretches over at least two ten-acre tracts. Ultimately, the Director concluded that the name Martin-Curren Tunnel is not ambiguous and does not create a latent ambiguity in Rangen's partial decrees.

The district court agreed with the Director, finding that the term "Martin-Curren Tunnel" refers to a specific, identifiable and known diversion structure located within the ten-acre authorized point of diversion of Rangen's two senior water rights. The court observed that the record establishes there is only one tunnel to which the term "Martin-Curren Tunnel" can possibly apply. The court further stated that "tunnel" could not conceivably refer to the entire spring complex because such an interpretation would offend the common meaning and understanding of the term "tunnel."

The reasoning of the Director and the district court is well-taken. The term "Martin-Curren Tunnel" does not lose clarity when applied to the facts in the record before the Court. Indeed, as the district court noted, adopting Rangen's perspective would render its partial decrees

less, rather than more, clear. Therefore, Rangen has not presented sufficient evidence to establish the existence of a latent ambiguity in the partial decrees.

We affirm the district court's determination that Rangen is limited to divert water only from the mouth of the Martin-Curren Tunnel itself and only within its decreed tract.

**4.      The doctrine of quasi-estoppel does not preclude the Director from interpreting Rangen's partial decrees to allow diversion of only the water emanating from the mouth of the Martin-Curren Tunnel.**

Rangen argues that quasi-estoppel precludes the Director from determining that the source elements of its partial decrees limit its rights to only the water flowing from the mouth of the Martin-Curren Tunnel. The Director and the district court each found that quasi-estoppel does not apply in this case. As this Court has previously stated,

> [Q]uasi-estoppel prevents a party from asserting a right, to the detriment of another party, which is inconsistent with a position previously taken. This doctrine applies when: (1) the offending party took a different position than his or her original position, and (2) either (a) the offending party gained an advantage or caused a disadvantage to the other party; (b) the other party was induced to change positions; or (c) it would be unconscionable to permit the offending party to maintain an inconsistent position from one he or she has already derived a benefit or acquiesced in. Estoppel theories generally present mixed questions of law and fact. Because mixed questions of law and fact are primarily questions of law, this Court exercises free review.

*Allen v. Reynolds*, 145 Idaho 807, 812, 186 P.3d 663, 668 (2008) (citations and internal quotation marks omitted). Quasi-estoppel does not apply in the present case, both because there are no exigent circumstances justifying applying the doctrine against a state agency exercising a governmental function and because Rangen has not established that the elements of quasi-estoppel are satisfied.

Rangen cites no cases where this Court has applied quasi-estoppel against a government entity carrying out its sovereign functions. Indeed, the Court has held that quasi-estoppel may not "be applied against the state in matters affecting its governmental or sovereign functions." *Floyd v. Bd. of Comm'rs of Bonneville Cnty.*, 137 Idaho 718, 727, 52 P.3d 863, 872 (2002). However, the Court has previously left open the possibility that quasi-estoppel could apply against a government entity in exigent circumstances. *See, e.g.*, *Terrazas v. Blaine Cnty. ex rel. Bd. Of Comm'rs*, 147 Idaho 193, 200–201, 207 P.3d 169, 176–177 (2009); *Sprenger, Grubb & Assocs., Inc. v. City of Hailey*, 127 Idaho 576, 583, 903 P.2d 741, 748 (1995); *Boise City v. Wilkinson*, 16

14

Idaho 150, 177, 102 P. 148, 157 (1909). These cases do not express whether quasi-estoppel might apply even where the government action at issue relates to a sovereign or governmental function. Nor do the cases disclose what constitutes an exigent circumstance warranting the application of the doctrine against the government. The Court expresses no opinion on these questions at this time.

Idaho Code section 42-602 requires the Director to "distribute water in water districts in accordance with the prior appropriation doctrine." In the present case, that statutory obligation required the Director to interpret Rangen's partial decrees, which he dutifully did. Rangen has failed to articulate any exigent circumstances justifying the application of quasi-estoppel against IDWR or the Director. Accordingly, we decline in this case to extend the doctrine of quasi-estoppel to apply to governmental entities or agents acting in a sovereign or governmental capacity.

Furthermore, Rangen has failed to establish that the required elements of quasi-estoppel are met. Rangen argues at length that IDWR has recognized for decades that the source of Rangen's water is the entire spring complex, citing two previous IDWR actions. First, Rangen cites to a 1979 order in which former IDWR Operations Bureau Chief L. Glen Saxton authorized Rangen to measure water flows at the outlets rather than the inlets. Second, Rangen cites to a 2005 order in Rangen's prior delivery call in which former Director Karl Dreher made findings about flow measurements at Rangen's facility. Former Director Dreher found that

> [t]he flow measurements that are considered to be representative of the total supply of water available to the Rangen hatchery facilities under water rights nos. 36-15501, 36-02551, and 36-07694, consist of the sum of the discharge from raceways designated by Rangen as the "CTR" raceways and the flow over the check "Dam." The dam is sited upstream from the discharge points from the CTR raceways and downstream from the discharge points from raceways designated by Rangen as the "Large" raceways. The sum of the discharge from the CTR raceways and the flow over the check dam is considered to be representative of the total supply of water available even though at times some of the flow over the check dam may include water flowing from small springs downstream from the diversion to the Large raceways, water discharged from the Large raceways that was not diverted through the CTR raceways, and irrigation return flows.

Second Amended Order at ¶54, In the Matter of Distribution of Water to Water Rights Nos. 36-15501, 36-02551, and 36-07694 (Idaho Dep't Water Res. May 19, 2005) *available at*

http://www.idwr.idaho.gov/browse/WaterMngmt/Orders-Archive/2005/05-19-2005%20Rangen %20Inc%20Second%20Amended%20Order.pdf.

The district court found that the Director has not taken a different position with respect to the interpretation of the source and point of diversion elements in Rangen's partial decrees, given that none of the cited agency actions addressed the questions of where Rangen is legally entitled to divert water and from which sources. The district court noted that the 1979 order predates Rangen's partial decrees so it could not have addressed the interpretation of those partial decrees. In context, the 2005 order did not interpret the partial decrees. Rather, it merely described Rangen's flow measurements—including acknowledging that the measurements might include water to which Rangen was presumably not entitled. We agree with the district court and hold that the Director has not changed positions, given that prior to this proceeding the Director had not taken any position on the interpretation of the source or point of diversion elements of Rangen's partial decrees. Thus, Rangen has failed to prove the first element of quasi-estoppel, that "the offending party took a different position than his or her original position." *Allen*, 145 Idaho at 812, 186 P.3d at 668.

For the foregoing reasons, we affirm the district court's holding that the doctrine of quasi-estoppel does not preclude the Director from interpreting Rangen's partial decrees to allow Rangen to divert water only from the mouth of the Martin-Curren Tunnel.

### B. The Director's adoption of Sullivan's 63/37 regression analysis is supported by substantial and competent evidence.

Applying the analysis above, Rangen is entitled to the water from the tunnel but not the water from the other springs. Accordingly, the Director needed to determine how the total water in the Rangen cell would be distributed between the tunnel and the other springs.

Three opinions of the proportion of water accruing to the tunnel versus the other springs were presented in this case. Pocatello's expert witness Sullivan initially opined that 75% of the water in the Rangen model cell would accrue to the tunnel and 25% would accrue to the springs. However, Sullivan's initial 75/25 regression analysis was developed using Rangen's flow measurements, which all parties agreed were understated.[5] After learning of the errors in Rangen's flow measurements, Sullivan corrected the underlying data and created a new

---

[5] The Director found that Rangen used a nonstandard measurement method to measure water flows through its facility and used incorrect rating tables for determining flow rates, concluding that Rangen's reported historic flows were lower than actual flows.

regression analysis, ultimately opining that 63% of the water in the Rangen cell would accrue to the Curren Tunnel and 37% to the springs. IDWR staff independently developed a third analysis, determining that 70% of the water would accrue to the tunnel and 30% to the springs. The Director adopted Sullivan's 63/37 regression analysis.

Rangen challenges the sufficiency of the evidence supporting the Director's adoption of the Sullivan 63/37 analysis. The Sullivan 63/37 analysis was upheld by the Director on reconsideration and by the district court on judicial review. On appeal, Rangen presents substantially the same arguments rejected by the district court: the IDWR 70/30 analysis is more accurate than the Sullivan 63/37 analysis, Sullivan's revision of his analysis reduces his credibility, and Sullivan's corrected data are inaccurate. None of these arguments have merit.

Rangen argues extensively in its briefing for the adoption of IDWR's 70/30 analysis. But conflicting evidence is irrelevant because it has no bearing on the sufficiency of the evidence supporting the Director's adoption of Sullivan's 63/37 analysis. Nor is it significant that Sullivan changed his opinion when he learned of the error in the data on which he originally relied. If anything, the fact that Sullivan revised his analysis in light of new information makes it more, rather than less, credible.

Rangen also attacks Sullivan's 63/37 analysis by focusing on the data Sullivan relied on in forming his opinion. Rangen insists Sullivan's analysis is invalid because it is based on unreliable USGS measurements and because it may include water from other sources. In a staff memorandum responding to expert reports in this case, IDWR staff noted that the USGS subjectively rated its own measurements of Billingsley Creek as 'fair' or 'poor', indicating that the measurements are not ideal and contribute to measurement error. Nonetheless, the Director found that USGS flow measurements are widely accepted as accurate and objective measurements. Even if there is some evidence in the record supporting the conclusion that the USGS data is unreliable, Rangen has not established that it is so unreliable as to preclude a reasonable mind from accepting it to support a conclusion. This is particularly so where there is no dispute that Rangen's own measurements are flawed and Rangen points to no other evidence in the record suggesting alternative measurements that might be more reliable.

Rangen alleges that the USGS measurements were taken downstream from the Rangen measurements and likely include water that is not measured or used by Rangen. But Sullivan testified that the USGS measurements are intended to include only the spring flows and not any

irrigation returns. Sullivan also testified that USGS measurements made outside the irrigation season would not include water in any significant quantity from these irrigation returns. Rangen's conclusory assertion that the USGS measurements "likely include" additional sources of water is not evidence. Additionally, the conflicting evidence to which Rangen does cite fails to undermine the substantiality or competency of the evidence supporting the Director's finding that the USGS measurements are adequate. As the district court observed, Sullivan's 63/37 analysis is supported by substantial record evidence, including various reports and comparisons Sullivan authored, as well as Sullivan's hearing testimony.

Finally, Rangen argues that the weir coefficient Sullivan 'extrapolated' from the USGS measurements is different than the 'hybrid' weir coefficient Sullivan created and advocated for in his expert reports. However, Rangen neither cites to record evidence in support of this allegation nor articulates its legal significance. Therefore, the allegation does nothing to call into question the sufficiency of the evidence supporting the Director's adoption of Sullivan's 63/37 analysis.

For the foregoing reasons, we affirm the district court's holding that substantial evidence supported the Director's adoption of Sullivan's 63/37 regression analysis.

**C. The Director's conclusion that junior priority ground water users are using water efficiently and without waste is supported by substantial and competent evidence.**

Conjunctive Management Rule 40.03 provides that in responding to a delivery call "[t]he Director will also consider whether the respondent junior-priority water right holder is using water efficiently and without waste." IDAPA 37.03.11.040.03. The Director concluded in this case that the junior-priority water right holders are using water efficiently and without waste. The Director upheld this conclusion on reconsideration and the district court affirmed it on judicial review.

Rangen asserts that the Director's conclusion was not supported by substantial evidence. It alleges that an evaluation of whether water is used efficiently and without waste requires the introduction of evidence such as: water usage compared to crops in the field or other permitted uses; sprinkler package maintenance and replacement practices; and cultivation practices, including information such as crop selection, seed choice, crop rotations and use of cover crops and mulch. Rangen cites no authority for the proposition that the Rule 40.03 analysis requires

18

this evidence or that it requires any other specific evidence. Nor has this Court identified any such requirement.

Contrary to Rangen's suggestion, the record does disclose substantial evidence supporting the Director's conclusion that junior priority ground water users are using water efficiently and without waste. Lynn Carlquist, chairman of the North Snake Groundwater District, testified that most farmers in the District have converted from surface water irrigation to sprinkler irrigation to use water more efficiently and that farmers limit ground water pumping to minimize costs. Carlquist also testified that the District engages in projects to recharge ground water and monitors ground water levels in a way that would identify whether its members are using more water than they are entitled to. Tim Deeg, president of IGWA, testified that IGWA participates in recharge efforts, that cost considerations cause farmers to pump only as much water as they need, and that monitoring ensures that ground water pumpers operate within the parameters of their decrees. Justin Armstrong, Pocatello's Water Superintendent, testified as to the City's use of water. Rangen offered no evidence to controvert any of the testimony by these witnesses. Accordingly, the Director's conclusion that in this case junior priority ground water users are using water efficiently and without waste is supported by substantial and competent evidence.

For the foregoing reasons, we affirm the district court's determination that substantial evidence supported the conclusion that junior priority ground water users are using water efficiently and without waste.

**D. Rangen is not entitled to attorney fees on appeal. The Director is entitled to attorney fees on appeal.**

Both Rangen and the Director seek attorney fees on appeal pursuant to Idaho Code section 12-117(1). Idaho Code section 12-117(1) provides in relevant part:

> Unless otherwise provided by statute, in any proceeding involving as adverse parties a state agency . . . and a person, . . . the court hearing the proceeding, including on appeal, shall award the prevailing party reasonable attorney's fees . . . if it finds that the nonprevailing party acted without a reasonable basis in fact or law.

Rangen is not the prevailing party and, therefore, is not entitled to attorney fees. The Director is the prevailing party. The Director argues that Rangen's pursuit of this appeal was unreasonable.

In an appeal where the prevailing party sought attorney fees under section 12-117, the Court granted fees where the nonprevailing party

> continued to rely on the same arguments used in front of the district court, without providing any additional persuasive law or bringing into doubt the existing law on which the district court based its decision. Although the [nonprevailing parties] may have had a good faith basis to bring the original suit based on their interpretation of Idaho law, [they] were very clearly aware of the statutory procedures, failed to appeal separate appraisals when they had a right to appeal, and were clearly advised on the applicable law in an articulate and well reasoned written decision from the district court. Nevertheless, [they] chose to further appeal that decision to this Court, even though they failed to add any new analysis or authority to the issues raised below. Accordingly, it was frivolous and unreasonable to make a continued argument, and [the prevailing party] is awarded its reasonable attorney fees.[6]

*Castrigno v. McQuade*, 141 Idaho 93, 98, 106 P.3d 419, 424 (2005).

Here, Rangen asserted substantially the same arguments on appeal as it did before the district court on judicial review and failed to add significant new analysis or authority to support its arguments. Accordingly, applying *Castrigno*, the Court finds that Rangen acted without a reasonable basis in fact or law in bringing this appeal. Therefore, we grant the Director's request for attorney fees under Idaho Code section 12-117(1).

## V.
## CONCLUSION

We affirm the decision of the district court. The Director is awarded costs and attorney fees on appeal.


Justices EISMANN, BURDICK and HORTON, and Justice Pro Tem WALTERS CONCUR.

---

[6] The prevailing party in *Castrigno* also sought fees under section 12-121. *Castrigno*, 141 Idaho at 98, 106 P.3d at 424. Because the Court held that the nonprevailing party was "unreasonable," it may be inferred that this holding reflected a conclusion that "the nonprevailing party had acted without a reasonable basis" as required to support a fee award under section 12-117.